# UNITED STATES BANKRUPTCY COURT
## for the
## DISTRICT OF MASSACHUSETTS

```
=========================================
                                        *
In Re:                                  *
                                        *  Chapter 7
     BANK OF NEW ENGLAND CORP.,         *  No. 91-10126-WCH
                                        *
             Debtor                     *
                                        *
=========================================
```

## DECISION ON REMAND REGARDING
## THE TRUSTEE'S MOTION FOR ORDER
## AUTHORIZING A FOURTH INTERIM DISTRIBUTION

### *Introduction*

Dr. Ben S. Branch, the Chapter 7 Trustee of the Debtor (the "Trustee")

has filed the present Motion for Order Authorizing a Fourth Interim Distribution

(the "Motion"), as more particularly described below.[1]

---

[1] Although the Motion seeks to distribute not more than $11,000,000,
the Trustee agrees that the final resolution of this matter will apply to the
entire balance in the estate, which is something in excess of $100,000,000.
Trial Trans.II, 192:10-18 (statement of Trustee's counsel); Trial Trans. III
3:23-4:6 (agreement of parties' counsel).  (The transcripts for the hearing
held November 17, 2008, will be described as "Trial Trans. I" and "II;" those

In summary, the issue before me concerns interpretation of subordination provisions in public indentures governing three subordinated note instruments issued during the 1980s. Specifically, the issue to be determined is whether the parties to the subordinated indentures intended to permit holders of senior debt issued by Bank of New England Corporation and its predecessors ("BNEC") to receive post-petition interest prior to payment of BNEC subordinated debt. This is a contested matter within a core proceeding.[2]

In reaching my decision, I have considered the demeanor and credibility of all of the witnesses who testified, as well as the admitted exhibits and the submissions of counsel. Absence of mention of any of these does not indicate a lack of consideration. For the reasons stated, I grant the motion.

---

of November 18, 2008, as "Trial Trans. III" and "IV"; those of November 19, 2008, as "Trial Trans. V"; and references to the closing arguments of counsel, held January 29, 2009, as "Trial Trans. VI").

[2] 28 U.S.C. § 157(b)(2)(A),(B),(O); Fed. R. Bank. P. 9014.

*The Background*[3]

Bank of New England Corporation ("BNEC") filed this Chapter 7 case on January 7, 1991.[4]  The Trustee was elected by a vote of creditors on March 23, 1991.[5]  Prior to filing, BNEC and its predecessors had issued six separate issues of indenture debt.[6]  Three issues, described as the "Senior Debt,"[7] and represented by the "Senior Indentures," are entitled to the benefit of the contractual subordination provisions at issue here, and are represented by the "Senior Indenture Trustee."[8]  The remaining three issues

---

[3] Under the practice in this session, the parties have filed an Amended Joint Pre-Trial Statement, Docket No. 2247 ("APTS").  Under the terms of the APTS, facts which are admitted require no proof.  Further references to the APTS are to Section II of that document where the admitted facts appear.

[4] APTS ¶ 2.

[5] APTS  ¶ 3.

[6] APTS ¶  7.

[7] 7-5/8% Debentures, issued by CBT Corporation, a predecessor to BNEC, in 1973, supplemented in 1973 and 1985 (APTS ¶¶ 8,9); 8.85% Debentures, issued by New England Merchants Company, Inc., a predesessor to BNEC, in 1974 (APTS ¶ 10); and BNEC 9-1/2% Notes, issued in 1986 (APTS ¶ 11).

[8] HSBC Bank USA, as successor to the original trustees.  APTS ¶ 4. The Senior Trustee is directed by Gabriel Capital LP and its affiliate, Ariel Fund Ltd., which together hold a majority of the Senior Debt.  APTS ¶ 13.

3

(the "Junior Debt")[9] contractually subordinate payment in accordance with the terms of their indentures (the "Junior Indentures"), and are represented by the "Junior Indenture Trustees."[10]

Through prior interim distributions, the Trustee paid the Senior Indenture Trustee all allowed claims for principal and pre-petition interest plus post-petition fees and expenses incurred to the date of the last distribution.[11] He created a reserve to cover any future fees and legal expenses[12] and, in the Motion, proposes to make the next interim distribution to the Junior Indenture Trustees.[13]  The Senior Indenture Trustee objected, asserting its prior claim to the distribution.[14]

---

[9] BNEC Floating Rate Subordinated Notes, issued in 1984; BNEC 8-3/4% Subordinated Capital Notes, issued in 1987; and BNEC 9-7/8% Subordinated Notes, issued in 1989.  APTS ¶¶15-17.

[10] U.S. Bank Trust National Association, successor to Morgan Guaranty Trust Company and Bank of New York Trust Company, successor to Chemical Bank Delaware.  APTS ¶¶ 5, 6.

[11] APTS ¶¶ 23, 25-27.

[12] APTS ¶ 28.

[13] APTS ¶ 32.

[14] APTS ¶ 33.

4

I took the Motion under advisement and ultimately granted it.[15]  The Senior Indenture Trustee appealed to the United States District Court for the District of Massachusetts, which affirmed.[16]

Upon further appeal, the United States Court of Appeals for the First Circuit "vacated the decision of the district court and remanded with instructions that the district court vacate the judgment of the bankruptcy court and remand the matter to that tribunal for further proceedings consistent with [their] opinion."[17]  The district court acted as directed and returned the case to me.[18]

Both the Senior and Junior Indenture Trustees were in doubt as to the manner in which the First Circuit's mandate (described in detail below) was to be applied and requested my guidance.  I issued a preliminary decision in

––––––––––––––––––––

[15] *In re Bank of New Eng. Corp.*, 269 B.R. 82 (Bankr. D. Mass. 2001) ("BNEC1").

[16] *HSBC Bank USA v. Bank of New Eng. Corp. (In re Bank of New Eng. Corp.)*, 295 B.R. 419 (D. Mass. 2003) ("BNEC2").

[17] *HSBC Bank USA v. Branch (In re Bank of New Eng. Corp.)*, 364 F.3d 355, 368 (1st Cir. 2004), *cert. denied sub nom  U.S. Bank Nat'l Ass'n v. HSBC Bank USA*, 543 U.S. 926 (2004) ("BNEC3").

[18] Docket No. 1614.

which I described my views as to the burdens of the opposing camps.[19]

*The controlling indenture provisions*

Each of the Junior Indentures provides that it is governed by New York law and contains   provisions virtually identical to the following, which all parties have agreed may be considered applicable to all of the Junior Indentures.[20]

> [E]ach Holder likewise covenants and agrees by his acceptance thereof, that the obligations of the Company to make any payment on account of the principal of and interest on each and all of the Notes shall be subordinate and junior, *to the extent and in the manner hereinafter set forth*, in right of payment to the Company's obligations to the holders of Senior Indebtedness of the Company. . . .[21]

The "extent and manner" includes the following provision:

> The Company agrees that upon . . . any payment or distribution of assets of the Company of any kind or character, whether in cash, property or securities, to creditors upon any dissolution or winding up or total or partial liquidation or reorganization of the Company, whether voluntary or involuntary or in bankruptcy, insolvency, receivership, conservatorship or other proceedings, all principal (and premium, if any), sinking fund payments and interest *due or to become due* upon all Senior Indebtedness of the Company *shall first be paid in full*, or payment thereof

---

[19] *In re Bank of New Eng. Corp.*, 359 B.R. 384 (Bankr. D. Mass. 2007) ("BNEC4")

[20] APTS ¶¶ 41-44.

[21] Ex. 1 at § 1201, 78 (emphasis added).

provided in money or money's worth in accordance with its terms, before any payment is made on account of the principal of or interest on the indebtedness evidenced by the [Junior] Notes due and owing at the time . . . .[22]

The Junior Indentures define "Senior Indebtedness" of BNEC to mean:

[T]he principal of, premium, if any, and interest on (a) all indebtedness for money borrowed, whether outstanding on the date of execution of this Indenture or thereafter created, assumed or incurred, except (i) the Company's Floating Rate Subordinated Notes due 1996, (ii) such indebtedness as is by its terms expressly stated to be not superior in right of payment to the [Subordinated Notes] and (iii) such indebtedness as is by its terms expressly stated to rank pari passu in right of payment with the [Subordinated Notes], and (b) any deferrals, renewals or extensions of any such Senior Indebtedness.[23]

*The genesis of the Rule of Explicitness*

Because it frames the present decision, it is useful to reiterate the manner in which the issues presently before me were shaped.  In  my original decision granting of the Motion, I stated that:

The issue before me resolves itself into the meaning of the emphasized phrase "shall first be paid in full."  If that language does not encompass post-petition interest, the Trustee's position is well taken and the present motion should be granted as presented.  If it does have the added breadth, then the interim distribution should be authorized (no one disputes this) but payment would go to the Senior Indenture Trustees to the extent of post-petition interest, which appears to far exceed the amount

---

[22] *Id.* at § 1203, 78-79 (emphasis added).

[23] APTS ¶ 44.

7

proposed for distribution.[24]

I began my examination from the generally accepted genesis of what is

commonly called the Rule of Explicitness in *In re Time Sales Finance Corp.*:[25]

> [I]f a creditor desires to establish a right to post-petition interest
> and a concomitant reduction in the dividends due to subordinated
> creditors, the agreement should clearly show that the general rule
> that interest stops on the date of the filing of the petition is to be
> suspended, at least vis-a-vis these parties.[26]

Next in line is the *Kingsboro Mortgage* case,[27] where the United States Court

of Appeals for the Second Circuit held that language identical to that before

me "is insufficiently express to relate to post-bankruptcy interest."[28]

Finally, in its 1976 decision in *King Resources*, the United States Court

of Appeals for the Tenth Circuit adopted the holdings of *Kingsboro Mortgage*

---

[24] BNEC1 at 84-85.

[25] 491 F.2d 841, 844 (3d Cir. 1974).

[26] *Id.*

[27] *Bankers Life Co. v. Manufacturers Hanover Trust Co. (In re Kingsboro Mortg. Corp.)*, 514 F.2d 400 (2d Cir. 1975).

[28] *Id.* at 401.  The Second Circuit relied on *In re Time Sales Finance Corp.* It also asserted that its own decision in *In re Credit Industrial Corp.*, 366 F.2d 402, 408 (2d Cir. 1966) contained language "broad enough to permit any such provision despite Bankruptcy Act policies via-a-vis the bankrupt estate."  514 F.2d at 401, n.2.  No one seems to have accepted the language found in that case, and I have my doubts whether it really would satisfy the Rule of Explicitness.

and *Time Sales.*[29]

When the Bankruptcy Code replaced the Bankruptcy Act, it continued

the former law's rule that creditors would be denied post-petition interest.[30]

The Code, however, has a new provision in § 510(a):

> A subordination agreement is enforceable in a case under this
> title to the same extent that such agreement is enforceable under
> applicable nonbankruptcy law.

In the first *Southeast Banking Corp.* decision in 1995, almost twenty

years after the Bankruptcy Code became effective, and after the Junior

Indentures were issued, the question of the continued vitality of the Rule of

Explicitness was raised before Bankruptcy Judge Hyman.  He analyzed the

background and concluded that the Rule of Explicitness was alive and well:

---

[29] 528 F.2d 789 (10th Cir. 1976).  *King Resources, Kingsboro Mortgage*, and *Time Sales* are so often treated together by counsel and witnesses that they have acquired their own shorthand description as "the three cases," which I shall also adopt.

[30] *Compare* 11 U.S.C. § 63a (repealed) ("Debts of the bankrupt may be proved and allowed against his estate which are founded upon (1) a fixed liability, as evidenced by a judgment or an instrument in writing, absolutely owing at the time of the filing of the petition by or against him, whether then payable or not, with any interest thereon which would have been recoverable at that date. . . .") *with* 11 U.S.C. § 502(b)(2) ("[I]f such objection to a claim is made, the court . . . shall determine the amount of such claim . . . as of the date of the filing of the petition, and shall allow such claim in such amount, except to the extent that . . . (2) such claim is for unmatured interest. . . .").

9

As previously established, the senior debentureholders, as unsecured creditors, do not have a claim against the Debtor's insolvent estate for payment of post-petition interest or for attorney fees and casts pursuant to § 502 and § 506 of the Bankruptcy Code. However, senior debentureholders may have a contractual right to payment of post-petition interest from monies otherwise payable to the junior debentureholders, if the language of the Indentures specifically provide for such a contractual right. The issue presented to the Court is one of contract interpretation, namely, whether the Indentures contain language sufficient in clarity to support an interpretation that the junior debentureholders intended and agreed to pay from their own distributions, sums to the senior debentureholders that are not otherwise due and owing from the obligor, the Debtor's estate. Courts interpreting the rights and obligations between senior and junior debentureholders under indentures with similar, if not identical, language have unanimously required express contractual language to clearly, explicitly, precisely, and unambiguously provide for payment of post-petition interest to unsecured senior debentureholders when such amounts were not otherwise due and owing from the obligor. This requirement . . . has become known as the Rule of Explicitness, which requires notice of precisely to what obligations one is agreeing to subordinate before that particular subordination will be enforced.

The Rule of Explicitness, is not a "rule of judicial reallocative equity" as posited by the Plaintiffs. Instead it is a rule of contract construction that requires a junior creditor to receive clear and unambiguous notice before a Court will imply an intent to subordinate to amounts not otherwise due and owing under applicable law.

* * *

The Plaintiffs argue, in an attempt to avoid the Rule of Explicitness, that Congress overruled the Rule of Explicitness in enacting § 510 of the Bankruptcy Code. The Plaintiffs have cited no authority, however, to support this argument. To the contrary, applicable case law and respected treatises agree with this Court

10

that § 510 of the Bankruptcy Code codified pre-Code case law in which courts uniformly enforced subordination agreements according to their terms.  There is no legislative history to support the notion that Congress intended to overrule either the pre-Code case law or the Rule of Explicitness.[31]

On appeal, the United States Court of Appeals for the Eleventh Circuit acknowledged that the Rule of Explicitness was the pre-Code rule of law.[32]

It disagreed with the courts below as to the origin and vitality of the Rule:

> The Junior Creditors argue that section 510(a) and its direction to enforce subordination agreements according to nonbankruptcy law is irrelevant to this dispute because the Rule of Explicitness is a rule of contract interpretation—not enforcement.  Regardless of whether we characterize the Rule of Explicitness as interpretation or enforcement, however, section 510(a)'s instruction to enforce subordination agreements on par with other contracts under nonbankruptcy law constitutes a plain departure from the prior practice of enforcing and interpreting those agreements pursuant to the bankruptcy court's equitable powers.  Although the Junior Creditors have argued to the contrary, the Rule of Explicitness developed as a tool for the exercise of those equitable powers.   Section 510(a)'s instruction to enforce subordination agreements according to nonbankruptcy law, therefore, appears to cut away the equitable mantle under which

---

[31] *Chemical Bank v. First Trust of N.Y., Nat'l Ass'n (In re Southeast Banking Corp.)*, 188 B.R. 452, 464-65 (Bankr. S.D. Fla. 1995) (footnotes omitted) ("Southeast 1").  In addition to the three cases, the Court relied upon *First Fidelity Bank, Nat'l Ass'n v. Midlantic Nat'l Bank (In re Ionosphere Clubs, Inc.)*, 134 B.R. 528 (Bankr. S.D.N.Y. 1991) and 3 Collier on Bankruptcy § 510.1.

[32] *Chemical Bank v. First Trust of N.Y., Nat'l Ass'n (In re Southeast Banking Corp.)*, 156 F.3d 1114, 1120 (11th Cir. 1998)( "Southeast 3").

11

the bankruptcy courts fashioned the Rule of Explicitness.[33]

It found, however, that

> section 510(a)'s command to enforce subordination agreements on par with other contracts under the applicable nonbankruptcy law [is] a sufficient indication that Congress intended to depart from the previous regime of enforcing and construing these private contracts in federal equity. . . .  Accordingly, we conclude that Congress, by enacting section 510(a) of the Bankruptcy Code, abrogated the pre-Code rule of explicitness.  As a necessary consequence of this change in bankruptcy law, the Rule of Explicitness can no longer survive as the progeny of the bankruptcy courts' equity powers or as a federal canon of contract construction.[34]

It continued in a footnote:

> Regardless of whether the Rule of Explicitness was a creation of law or equity, the source of the rule of undeniably *federal* and not state law.  Our conclusion that Congress, by designating state law as the appropriate vehicle by which to enforce subordination contracts, removed the rule's authoritative foundation, therefore, applies regardless of whether pre-Code practice depended upon equity or federal law.[35]

While the court believed that New York law would not "disturb the

heretofore uniform treatment of this question, particularly given the evidence

---

[33] *Id*. at 1121-22.

[34] *Id*. at 1124. (citations omitted).

[35] *Id*. at  1122 n.10 (emphasis in original).

that the capital markets appear to have adjusted to the Rule of Explicitness"[36]

it concluded that it would certify the issue to the New York Court of Appeals

phrased as follows:

> What, if any language does New York law require in a subordination agreement to alert a junior creditor to its assumption of the risk and burden of the senior creditor's post-petition interest?[37]

The New York Court of Appeals recognized the federal equity origin of

the Rule of Explicitness, but adopted it as a principle of general state contract

law:

> ...we recognize that [the subordination agreements at issue] and many others were drafted and entered into before the Rule of Explicitness was called into question by the ruling of the Eleventh Circuit in the instant case.
>
> * * *
>
> Parties to subordination agreements undoubtedly relied on the Rule-–their lawyers would have been quite remiss had they not—since recent case law and many commentators have consistently recognized the continued vitality of the Rule.[38]

---

[36] *Id*. at 1124.

[37] *Id*. at 1125.

[38] *In re Southeast Banking Corp.*, 93 N.Y.2d 178, 184, 710 N.E.2d 1083 (1999) ("Southeast 4"), *citing First Fidelity Bank v. Midlantic Nat'l Bank (In re Ionosphere Clubs, Inc.)*, 134 B.R. 528 (S.D.N.Y. 1991); 4 COLLIER, BANKRUPTCY § 510.03[3] (15th ed. rev.); Landers and Coleman, *Claims Issues*, 767 PLI/Comm 819, 846 (1998) introduced into evidence as

Responding to the certified question, the New York Court of Appeals stated:

> In accordance with the Rule of Explicitness, New York law would require specific language in a subordination agreement to alert a junior creditor to its assumption of the risk and burden of allowing the payment of a senior creditor's post-petition interest.[39]

I adopted the New York Court of Appeals' response as controlling and granted the Motion,[40] which action was affirmed by the District Court.[41]

*The death of Explicitness*

The First Circuit recognizing a conflict with the Eleventh Circuit,[42] took a different approach:

> As the litigants and the lower courts have framed the issue, the

---

Ex. 232; Comm. On Bankruptcy and Corporate Reorganization of the Ass'n of the Bar of the City of N.Y., *Structured Financing Techniques*, 50 Bus. Law. 527, 555 n.80 (1995), introduced into evidence as Ex. 230; Zinman, *Under the Spreading Bankruptcy: Subordinations and the Codes*, 2 ABI L. Rev. 293, 294 n. 10 (1994), introduced into evidence as Ex. 229; Goldstein and Mckenna, *Intercreditor and Suborination Issues*, 793 PLI/Corp 679, 700 (1992), introduced into evidence as Ex. 228; Sheneman, *Classification and Allowance of Claims*, 429 PLI/Comm 931, 974 (1987), introduced into evidence as Ex. 223; Phelan, Conner and Kinsella, *Word Wars: Structuring and Documenting Secured Loan Terms Under the Bankruptcy Code*, 427 PLI/Comm 127, 274 (1987), introduced into evidence as Ex. 224.

[39] *Id*. at 186.

[40] BNEC1 at 86.

[41] BNEC2.

[42] BNEC3 at 359.

> pivotal question is whether the language of the subordination provisions satisfies the Rule of Explicitness. We do not agree that this is the correct question.[43]

The First Circuit characterized the Rule of Explicitness as an "equitable doctrine . . . [that] evolved into a requirement that only unequivocal language could overcome the generic bar on recovery of post-petition interest."[44] Recognizing that § 510(a) specifically addresses subordination agreements, it concluded that its enactment supplanted "the judge-made equitable doctrine through which courts previously had dealt with such agreements."[45]  Its conclusion, consistent with the Eleventh Circuit decision, was:

> The short of it is that the enforceability of subordination agreements in bankruptcy must be judged by reference to generally applicable state contract law. As it pertains here, this holding limits our consideration to the general principles of New York contract law. If—and only if—the Rule of Explicitness is such a general principle can it be given effect in this case.[46]

Having posed the question of whether the Rule of Explicitness survived the enactment of § 510(a) as part and parcel of state law, the First Circuit, breaking with the Eleventh Circuit, answered in the negative:

---

[43] *Id*. at 361.

[44] *Id*. at 362 (citations omitted).

[45] *Id*.

[46] *Id*. at 364.

15

> Although we are in something of an epistemological quandary—it
> is always difficult to prove a negative—the near-total absence of
> authority is compelling proof that the Rule of Explicitness is not
> part of New York's general contract law.[47]

It concluded that the question, as framed by the Eleventh Circuit, was beyond

the competence of the New York Court of Appeals to answer because it

impermissibly invited the enunciation of a bankruptcy-specific rule as part of

state jurisprudence, as evidenced by reference to "'post-petition interest'- a

term of art applicable only in bankruptcy."[48]  Noting the absence of any state

law rules of interpretation applied specifically to subordination agreements,

the First Circuit held that "there is simply no reason to believe that the New

York courts would apply the Rule of Explicitness outside the bankruptcy

context."[49]

Applying New York's general contract law, the First Circuit held that the

phrase "due or to become due" was lacking in certitude, "to be resolved

through a contextual examination of the parties' intent, taking full account of

the surrounding facts and circumstances."[50]  It remanded the matter for

---

[47] *Id.* at 365.

[48] *Id.*

[49] *Id.*

[50] *Id.* at 367.

"differential factfinding" with respect to "the parties' intent vis-á-vis post-petition interest," but offered some parting guidance:

> To be sure, the backdrop of bankruptcy may inform the examination into the parties' intent. *See Dolman v. U.S. Trust Co.*, 2 N.Y.2d 110, 157 N.Y.S.2d 537, 541-42, 138 N.E.2d 784 (N.Y.Sup.Ct.1956) (noting the presumption "that the parties had [the law in force at the time of agreement] in contemplation when the contract was made," and that the contract generally will be "construed in light of such law"). Here, however, the effect of that tenet is uncertain absent further factfinding.[51]

As will be explained in greater detail below, this tenet will direct the course of my analysis.

*"Differential factfinding"*

The First Circuit's mandate on remand was to determine the intent of the parties by "differential factfinding."[52]   On remand I found unanimous confusion among the parties as to how to proceed.  I bifurcated the issue of burden of proof, held a hearing and received post-hearing memoranda.[53]  I concluded that "the New York courts would treat the issue [as] one of

---

[51] *Id*. at 368 n. 5.

[52] BNEC3 at 368.  "[I]f a contract provision is reasonably susceptible of more than one interpretation, facts and circumstances extrinsic to the agreement can be considered to determine the intention of the parties." *Winston v. Mezzanine Invs., L.P.*, 170 Misc. 2d 241, 249, 648 N.Y.S.2d 493, 499 (Supr. Ct. 1996).

[53] For the arguments of the parties, *see* BNEC4 at 388.

interpleader."  Relying on a basic resource, I stated that:

> Each claimant in an interpleader action has the burden of
> establishing his or her own claim or right to any part of the
> impleaded money, and relative priority as to all other claimants.
> Each claimant must show his or her entitlement to the disputed
> funds by a preponderance of the evidence. All claimants must
> recover on the strength of their own title, rather than on the
> weakness of that of the adversary.[54]

As a result, I held an evidentiary hearing on November 17-19, 2008, at which

witnesses were heard by deposition excerpts or in person, and just under two

hundred exhibits[55] were introduced.   Closing arguments were heard on

January 29, 2009, and post-trial memoranda were filed.  I then took the matter

under advisement.

### *Positions of the Parties*

Having held that each claimant must establish its own claim by a

preponderance of the evidence,[56] the parties staked out their positions.  In the

case of the Senior Trustee, it was necessary for it to demonstrate that, in the

---

[54] BNEC4 at 389 (*quoting* 48 C.J.S. Interpleader § 36 (2006)
(footnotes omitted)). *See also Conn. Car Rental, Inc. v. Prime One Capital
Co., LLC*, 247 F.Supp. 2d 158, 165 (D. Conn. 2003) (*citing Midland Ins.
Co. v. Friedgood*, 577 F. Supp. 1407, 1411 (S.D.N.Y. 1984)).

[55] Joint exhibits were numbered 1 -24, Senior Trustee's exhibits
between 25 and 185, and Junior Trustees' exhibits between 201-288.
Further references to exhibits will be by number only.

[56] BNEC4 at 389.

absence of specific language to the contrary, "paid in full" meant just that, and

included post-petition interest.  The Junior Trustees, on the other hand, had

the burden of establishing that, lacking the specific language, the senior debt

had no right to post-petition interest, from the debtor or from funds otherwise

payable on the Junior Indentures.

*Findings of Fact and Conclusions of Law*[57]

*The empty chair*

It should be noted at the outset that no party actually involved in the

drafting of the Junior Indentures was located.  In an effort to deal with this

"empty chair," the Senior Trustee attempted to demonstrate that it was the

market's expectation that post-petition interest would be included, while the

Junior Trustees sought to establish that the Rule of Explicitness was

consistent with the custom and practice in the 1980s.  As a result, the parties

offered the testimony of persons active in the field in the 1980s, but none that

had any direct knowledge of the intent of the unknown scrivener.

*The underlying ambiguity*

All of the decisions relevant to the issues before me are based upon

---

[57] Fed. R. Civ. P. 52, made applicable here by Fed. R. Bankr. P.
9014 *via* Fed. R. Bankr. P. 7052.

agreement that the phrases "due or to become due" and "paid in full" are ambiguous. Although not stated in so many words, the concept universally accepted is that there is an underlying issue of "due *from whom*" or "paid in full *by whom*." Taking a general look at the language at issue, there are two possible readings: either the subordination is satisfied because the senior has received all that it will ever receive from the debtor, and hence there is no obligation to which the subordination applies, or, the junior having agreed to subordinate until the senior has received full payment (it matters not from whom), the junior's subordination remains in force and sums otherwise payable to the junior must be turned over to the senior. The language contains this ambiguity, there is no plain meaning, and principles of contract interpretation must be applied.[58] It is clarification of those points that will guide the determination of the issue before me.

*Applicable rules of construction*

While directing me to perform a "contextual examination of the parties' intent,"[59] the First Circuit noted that under New York law it is presumed that "'the parties had [the law in force at the time of the agreement] in

_____

[58] *See* Edwin W. Patterson, *The Interpretation and Construction of Contracts*, 64 Colum. L. Rev. 833, 839 (1964).

[59] BNEC4 at 367.

contemplation when the contract is made,' and that the contract generally will be 'construed in light of such a law.'"[60] Therefore, "unless a contract specifically provides otherwise, the law in force at the time an agreement is entered into becomes as much a part of the agreement as though it was expressed or referred to therein. . . ."[61]  Although the First Circuit did not recognize it as such,  this rule of contract construction appears to function as a "principle of explicitness" (I deliberately avoid capitalization) under the general contract law of New York.  Because the First Circuit concluded that "the near-total absence of authority is compelling proof that the Rule of Explicitness is not part of New York's general contract law," I find myself in a bit of a quandary: Is this language a square holding that there is no principle of explicitness in the general contract law of New York, so that this negative statement forms the law of the case and, to borrow a favorite phrase from the First Circuit decisions, I need go no further? Or is it dicta, by which I am not constrained?

The First Circuit has outlined the holding/dicta distinction:

---

[60] BNEC4 at 368 n. 2 (*citing  Dolman v. U.S. Trust Co.*, 2 N.Y.2d 110, 157 N.Y.S.2d 537, 541-42, 138 N.E.2d 784 (N.Y.Sup.Ct.1956)).

[61] *Dinerman v. Nat'l Bank of N. Am.*, 89 Misc. 2d 164, 390 N.Y.S.2d 1002 (N.Y. Sup. Ct. 1977); *Dolman*, 2 N.Y.2d at 116.

21

> We have held that "when a statement in a judicial decision is essential to the result reached in the case, it becomes part of the court's holding." Rossiter v. Potter, 357 F.3d 26, 31 (1st Cir. 2004). The result, along with those portions of the opinion necessary to the result, are binding, whereas dicta is not. Id. "Dictum constitutes neither the law of the case nor the stuff of binding precedent," Dedham Water Co. v. Cumberland Farms Dairy, Inc., 972 F.2d 453, 459 (1st Cir. 1992); rather, it "comprises observations in a judicial opinion or order that are 'not essential' to the determination of the legal questions then before the court." Municipality of San Juan v. Rullán, 318 F.3d 26, 29 n.3 (1st Cir. 2003) (quoting Dedham...); see also Pierre N. Leval, Judging Under the Constitution: Dicta About Dicta, 81 N.Y.U. L. Rev. 1249, 1256 (2006) (Dictum is superfluous content—"an assertion in a court's opinion of a proposition of law which does not explain why the court's judgment goes in favor of the winner").[62]

Here, the First Circuit held that "[f]or purposes of this case . . . the Rule of Explicitness is a dead letter," and I am bound by that holding. If, however, the cause of death was § 510(a) of the Bankruptcy Code, I must make clear that the obituary is, to quote the First Circuit, for "the Rule of Explicitness in its classic form."[63]   In my opinion, determination of the existence or non-existence of a principle of explicitness in New York state law goes beyond the necessary holding of the First Circuit's decision—that the classic, federal law-originating, Rule of Explicitness, has not been the law since 1978 and that an analogous rule does not exist under New York law.

---

[62] *Arcam Pharm. Corp. v. Faría*, 513 F.3d 1, 3 (1st Cir. 2007).

[63] BNEC3 at 359.

22

Having so found, I may proceed consistent with rulings of the Supreme

Court of the United States, both ancient and current:

> If [general expressions] go beyond the case, they may be
> respected, but ought not to control the judgment in a subsequent
> suit when the very point is presented for decision.[64]

To apply the presumption acknowledged by the First Circuit, I must first

identify a substantive law in effect at the time the subordination agreements

were executed, one for which the agreements do not explicitly provide

otherwise, so that I may then presume the parties intended that it be

incorporated. The classic federal Rule of Explicitness cannot form the basis

of the presumption because the First Circuit held that it was abrogated in

1978 by the enactment of § 510(a), and was therefore no longer the law in

effect in the 1980s.[65] As the First Circuit did not address what presumption

might arise from the substance of New York law, the issue remains to be

investigated.

*Seeking a general principle of New York law*

Fortunately, it is not necessary to search the entire body of New York

---

[64] *Cent. Va. Cmty. College v. Katz*, 546 U.S. 356, 363 (2006) (*quoting Cohens v. Virginia*, 6 Wheat. 264, 5 L.Ed. 257 (1821)).

[65] I note, however, that the drafters' subjective understanding of the state of the law informs the parties' intent and therefore remains relevant to the application of the presumption.

23

law for an answer.    For the presumption to be at all helpful to my
determination of intent, the substantive legal concept must contain two
elements.    First, it must involve a debtor  with a contractual obligation to pay
a lender in full, including all principal, interest, and other charges.    Second,
there   must be a supervening principle of New York law that says that the
obligation to pay interest, though stated in absolute terms, will be cut off if a
particular event occurs.    And, of course, any instances which involve federal
law, including bankruptcy law, must be disregarded.

New York adopted the common law of England as its common law in its
Constitution of 1777.    As quoted by the Supreme Court of the United States,
it provided that:

> "[S]uch parts of the common law of England as did form the law
> of [New York on April 19, 1775] shall be and continue the law of
> this state, subject to such alterations and provisions as the
> legislature of this State shall, from time to time, make concerning
> the same.[66]
>
> The idea that insolvency proceedings terminated the payment of interest

---

[66] *Wilson v. Arkansas*, 514 U.S. 927, 933 (1995).  For a more
detailed history of the adoption of English law in New York, *see Findley v.
Falise (In re Joint Eastern and Southern Districts Asbestos Litigation)*, 878
F. Supp. 473, 522*ff*. (S.D.N.Y. 1995), *aff'd in part, vacated in part*, 78 F.3d
764 (2d Cir. 1996).

can be traced back at least to Blackstone.[67]  A decision in 1743, citing even

earlier cases, proclaimed to the then equivalent of bankruptcy trustees:

> Commissioners, after a man becomes a bankrupt, compute interest upon debts no lower than the date of the commission, because it is a dead fund, and in such a shipwreck, if there is a salvage of part to each person, in this general loss, it is as such as can be expected.[68]

These authorities were cited by the New York Court of Appeals as

recently as 1951, evidencing that the principle had survived legislative

---

[67] "...judgments and recognizances, (both which are debts of record, and therefore at other times have a priority) and also bonds and obligations by deed or special instrument (which are called debts by specialty, and are usually the next in order) these are all put on a level with debts by mere simple contract, and all paid pari passu.  Nay, so far is this matter carried, that, by the express provision of the statutes, debts not due at the time of the dividend made, as bonds or notes of hand payable at a future day, shall be paid equally with the rest, allowing a discount or drawback in proportion."  2 Blackstone, Commentaries 487-88.

[68] *Ex Parte Bennet*, 2 Atk. 527, 528 (1743). *See Sexton v. Dreyfus*, 219 U.S. 339, 345 (1911) ("For more than a century and a half the theory of the English bankrupt system has been that everything stops at a certain date.  Interest was not computed beyond the date of the commission."); *City of New York v. Saper*, 336 U.S. 328, 330 (1949) ("More than forty years ago Mr. Justice Holmes wrote for this Court that the rule stopping interest at bankruptcy had then been followed for more than a century and a half.  He said the rule was not a matter of legislative command or statutory construction but, rather, a fundamental principle of the English bankruptcy system which we copied.").

overruling in New York at least until that date.[69]  In that case, involving interest

claimed after an assignment for the benefit of creditors under the New York

statute, the court had no doubt, citing a number of decisions:

> The general rule is well settled that creditors are not entitled to
> post-assignment interest where the proceeds are insufficient to
> pay all creditors in full, because the "delay in distribution is the act
> of the law; it is a necessary incident to the settlement of the
> estate"; this general rule applies as between preferred and
> unpreferred creditors.[70]

Based upon this authority, I am convinced and hold that, under the law

of New York, interest on an obligation ceases upon the filing of an insolvency

proceeding of whatever nature by the obligor.  This appears to have been the

law of New York for so long that the memory of man runneth not to the

contrary.[71]

*Framing the presumption under New York law*

If, under New York law interest on an obligation ceases upon the filing

---

[69]*Pavone Textile Corp.*, 302 N.Y. 206, 97 N.E.2d 755 (1951), *aff'd
sub nom. United States v. Bloom*, 342 U.S. 912 (1952).  The summary
affirmance is based on *Saper, supra*.

[70] *Id*. at 210 (citations omitted).

[71] It also appears to have been the federal common law prior to the
enactment of the Bankruptcy Act.  *Thomas v. Western Car Co.*, 149 U.S.
95, 116-17 (1893) ("As a general rule, after property of an insolvent passes
into the hands of a receiver or of an assignee in insolvency, interest is not
allowed on the claims against the funds.").

26

of an insolvency proceeding unless the subordination agreements specifically provide otherwise, I may presume that the parties drafted them with the understanding that this was the law and that the agreements would be so construed. Here, the First Circuit previously held that "the words 'due or to become due' [are] lacking in certitude as to whether they actually provide for the payment of post-petition interest on the Senior Debt prior to any payment referable to the Junior Debt."[72] I conclude that under the applicable New York rules of contract interpretation, the subordination agreements do not provide otherwise, forming a presumption that drafters did not intend for the payment of interest accruing after the commencement of an insolvency proceeding.

To be clear, this presumption only sets the stage for further inquiry and by no means relieves me of my obligation to conduct "a contextual examination of the parties' intent, taking full account of the surrounding facts and circumstances." This investigation involves a truly convoluted study of the law and facts, as the facts depend in large part on what the parties considered to be the prevailing law. I turn to an examination of the context in which the issues arose.

*The surrounding facts and circumstances*

---

[72] BNEC4 at 367.

27

To put the transactions in context, the issuance of indentures such as those here involved requires a large cast of parties. First, there is the issuer, in this case BNEC. Next is the managing underwriter, whose function is to work with the issuer to structure the transaction, prepare a prospectus and obtain necessary regulatory approvals, and offer the securities for sale in connection with a syndicate of other underwriters who are marketing the securities. There is also a trustee for the issue, generally a bank, which acts on behalf of the holders of the securities. Each party has a different function. All of these parties are generally represented by counsel.[73]

The functions of the parties vary. For example, the witnesses agreed that the drafting of the indenture is generally undertaken by counsel for the issuer or the underwriter.[74] Two attorneys peripherally involved in the drafting process were called as witnesses.

Alan Dean ("Dean") testified by way of his deposition. He was the designated representative of Davis Polk & Wardwell ("Davis Polk") under Rule 30(b)(6). As such he is required to testify "about information known or

---

[73] These facts so permeate the transcript that no particular citation would be helpful.

[74] Deposition of John J. Cashin, October 27, 2008 ("Cashin Depo") 17:18-23; Trial Trans. II, 156:4-13.

28

reasonably available to the organization."[75]  The subpoena issued to Davis

Polk sought:

> all knowledge Davis Polk has regarding the subordination provisions of the Bank of New England 1987 junior indenture and the Bank of New England 1989 junior indenture.  And in particular Davis Polk's understanding of the parties' intent vis-a-vis post petition interest, including but not limited to the terms "payment in full" and "interest due or to be [sic] due" found therein or any and all knowledge of the parties' intent with respect to these matters.[76]

In preparation for his testimony, Dean inquired of Fritz Link ("Link"), the

(now retired)[77] partner who was in charge of the 1987 transaction, although

Link had no recollection of it.[78]  Dean himself was in charge of the 1989

transaction.[79]  He did not have any specific recollection of drafting the 1987

indenture, but believed that "we did have a role in [the] drafting,"[80] and that it

was prepared on Davis Polk word processing equipment.[81]  It was his belief

---

[75]  Fed. R. Civ. P. 30(b)(6).

[76] Deposition of Alan Dean, December 20, 2006 ("Dean Depo"), 8:12-25. (Quotation marks have been added for clarity).

[77] *Id.* at  10:16-20.

[78] *Id*. at 13:6-7.

[79] *Id*. at 9:23-25.

[80] *Id*. at 12:16-20.

[81] *Id*. at 14:7-10.

that the 1989 indenture was drafted by Wachtell, Lipton, Rosen & Katz ("Wachtell").[82]  Wachtell represented Bank of New England in both the 1987 and 1989 offerings, and Davis Polk represented the underwriters in both.

Jay A. Levenson ("Levenson") was an associate in the corporate department of Wachtell from 1981 to 1988,[83] and was counsel to BNEC in the drafting of the 1987 indenture.[84]   The Senior Trustee attempted to demonstrate that Levenson promised the SEC to include Rule of Explicitness language in the prospectus for that issue, but I find otherwise.  The evidence played out as follows.

In the course of preparing for SEC registration of the 1987 indenture, Levenson received comments from SEC staff which included a statement that

> Disclosure should be provided of the relative rank of other subordinated debt and general creditors in the event of insolvency prior to and at maturity.[85]

He assumes that he prepared the response letter to the SEC which he

------

[82] *Id*. at 20:1-4; 37:18-24.

[83] Deposition of Jay A. Levenson, January 29, 2008 ("Levenson Depo") 8:17-23, 9:2-5.

[84] *Id*. at 12:2-7.

[85] Ex. 9.

signed, although he does not recall writing it.[86]   That letter, which was

introduced into evidence,[87] responds to the SEC comment as follows:

> Disclosure has been added to page 7 of the Prospectus, based
> upon disclosure found on page S-3 of the Prospectus Supplement
> of First Interstate Bankcorp dated March 25, 1987 relating to
> $200,000,000 . . . Subordinated Capital Notes . . . a copy of which
> page is attached to this letter.[88]

The attached photocopy has certain language manually bracketed, and

Levenson assumed that the language from First Interstate to which his letter

refers is the bracketed text[89] and only the bracketed text.[90]  The bracketed text

reads:

> The following subordination provisions do not apply to creditors of
> the Corporation who do not hold Senior Indebtedness.  In the
> event of the bankruptcy or insolvency of the Corporation before or
> after maturity, such other creditors would rank *pari passu* with
> Holders of the Subordinated Debt Securities, subject, however, to
> the broad equity powers of a federal bankruptcy court pursuant to
> which such court may, among other things, reclassify such other
> creditors into a different class of creditors which could be senior
> to the Holders of Subordinated Debt Securities.[91]

---

[86] Levenson Depo, 16:17-22.

[87] Ex. 207.

[88] *Id*. at 3.

[89] Levenson Depo, 22:3-11.

[90] *Id*. at 22:18-22.

[91] Ex. 207 at 8-9.

31

If one reads further down the copied page, other language is found which could be relevant to the issues before me, hence this protracted discussion of a minor point. It reads:

> No payment of principal of, or premium, if any, or interest on the Subordinated Debt Securities may be made and no Holder of the Subordinated Debt Securities shall be entitled to demand or receive such payment (I) unless all amounts then due for principal of and interest (*including interest accruing subsequent to the commencement of any proceeding for the bankruptcy or reorganization of the Corporation under any applicable bankruptcy, insolvency, or similar law now or hereafter in effect*) on all Senior Indebtedness of the Corporation have been paid in full or duly provided for. . . .[92]

Levenson states the language only referred to general and subordinated creditors; not senior creditors.[93] "The parenthetical that starts "including interest accruing" does not appear in [the BNEC prospectus]."[94] On this point, based upon the wording of the SEC letter and Levenson's specific response, I accept and find as a fact his view as to the extent of the First Interstate language intended to be conveyed to the SEC.

This is as close to the drafters of the indentures as the evidence permits, and it is hardly helpful. The Junior Trustees offered other

---

[92] *Id*. at 9 (emphasis added).

[93] Levenson Depo, 31:3-8.

[94] *Id*., 34:9-19.

inconclusive evidence in the form of the Davis Polk & Wardwell Manual for Lawyers Reviewing Trust Indentures for Morgan Guaranty Trust Company of New York (the "Davis Polk Manual").[95]   The Davis Polk Manual was prepared in 1977, for use by Davis Polk lawyers in advising Morgan Guaranty's Corporate Trust Department.   It contains a section titled "Subordinated Issues" in which the three cases are discussed.   The Davis Polk Manual further provides that:

> Following these instructions of the court, then, lawyers representing senior debt may wish to add . . . INCLUDING WITHOUT LIMITATION, EXCEPT TO THE EXTENT, IF ANY, PROHIBITED BY MANDATORY PROVISIONS OF LAW, POST-PETITION INTEREST IN ANY BANKRUPTCY, ARRANGEMENT, REORGANIZATION OR SIMILAR PROCEEDING) before the holders of the [junior debt] are entitled to receive any payment . . . .[96]

By its own terms, the Davis Polk Manual contemplates periodic supplements or revisions, but there is no evidence before me that any were produced.[97]

Patrick J. Crowley ("Crowley"), a vice-president and senior corporate trust officer at Morgan Guaranty during the 1980s, testified that he was personally involved in the training of Davis Polk associates and used the

---

[95] Ex. 214.

[96] *Id.* at 85-86.

[97] *Id.* at 6.

33

Davis Polk Manual as a general reference. [98]  Crowley, however, was not

involved in the drafting or negotiating of subordination provisions, and never

used the subordination section of the Davis Polk Manual.[99]  Ultimately, there

is no evidence that anyone involved with the drafting of the relevant

subordination provisions ever had or referred to the Davis Polk Manual.  At

best, it suggests the existence of an institutional knowledge at Davis Polk with

respect to the Rule of Explicitness, but that is hardly conclusive.  I must cast

my net wider.

The indenture trustee is a principal player in the process.  As noted, the

trustee is generally a bank which performs its duties through a department

dealing with trust administration.   A number of witnesses with substantial

experience in that field testified.

John I. Landau ("Landau") was called as an expert witness by the

Senior Trustee.  His career in corporate trust administration and management

spans 47 years.[100]  Landau  is the author of *Corporate Trust Administration*

---

[98] Trial Trans. III, 88:3-22, 95:11-15.

[99] *Id.* at 90:1-91:19, 97:24-98:10.

[100] Trial Trans. II, 127:25-128:4.

34

*and Management*, now in its sixth edition.[101]   He also taught corporate trust for many years, primarily to bankers but also to some lawyers and regulators.[102]   Like all of the other witnesses who were trust administrators, he did not know about the Rule of Explicitness — "nobody ever heard of it."[103] He first heard of the Rule when he was retained as an expert.[104]   He testified that an indenture trustee would have no pre-existing view of how subordination provisions would work — "Absolutely not."[105]   "Corporate Trustees did not get involved in negotiating the so-called business part of the transaction of which subordination's a part."[106]   Changing the business deal is "not within the purview of Corporate Trustees."[107]

Similar testimony was provided by John J. Cashin ("Cashin"), the Rule 30(b)(6) representative of Chase Bank USA.   He had been involved in trust

---

[101] *Id*. at 146:3-16.   Portions of the third edition were introduced into evidence as Ex. 263.

[102] *Id*. at 141:5-142:11.

[103] *Id*. at 143:9-11.

[104] *Id*. at 144:16-22.

[105] *Id*. at 150:1-5.

[106] *Id*. at 154:2-4.

[107] *Id*. at 140:15-19.

administration for 33 years.[108]   Cashin specifically remembers getting the

1989 indenture draft.[109]  When he reviewed it he focused on "the obligations

of the trustee or the potential obligations and duties of the trustee."[110]   His

function was to comment only on the duties of the trustee.[111]  However, based

upon his experience on creditors' committees in bankruptcy case and

throughout his career,[112] it was the position of the bank that "it would be the

interest and principal due to the senior holders up to and including the

petition, but not postpetition interest" to which the seniors would be entitled.[113]

The investment banker is a prime mover in the issuance of debentures.

William H. Purcell ("Purcell"), an investment banker with forty years

experience, was called as an expert by the Senior Trustee.  His testimony is

best considered as covering two points, (1) the meaning of the phrase "paid

in full" and (2) the language used in a variety of debt instruments issued in the

same years as the Junior Indentures.

---

[108] Cashin Depo 12:10-13.

[109] *Id*. at 24:5-8.

[110] *Id*. at 26:16-21, 29:21-25.

[111] *Id*. at 27:3-10.

[112] *Id*. at 54:10-55:10, 56:21-57:19, 59:4-24.

[113] *Id*. at 53:1-9.

As to the former, and unlike the First Circuit and others who have been

faced with the issue, the meaning of "paid in full" is obvious and elementary

to Purcell:

> Q.  And when you use the term there, "paid in full," can you just tell us what your understanding as an investment banker working at the time in the 1980s, what does that mean, what does that concept of "paid in full" mean in terms of the relationship between senior debt and subordinated debt?

> A.  Well, "paid in full" is just a very standard economic in investment banking term that means basically what it says, you lend money to somebody and you want to get back all that money that you lent . . . and that as long as your principal  is outstanding, the amount of interest that would be due on the principal amount that was still outstanding, you would be paid your principal, you would also be paid the full amount of interest that was due on that principal prior to it being repaid.

> Q.  And in your opinion as somebody working in investment banking in the 1980s on these transactions, what you've just described, was that also the understanding of the investment banking community on these transactions?

> A.  Absolutely.  I mean that's, if you will, Corporate Finance 101.

> Q.  And in your opinion, working on transactions involving senior debt and subordinated debt, does the concept of "paid in full" that your just described change in any way with the filing of the bankruptcy of the issuer as the "paid in full" relates between senior and subordinated debt?

> A.  *Absolutely not.  It does not change at all. . .*

* * *

> But if there's subordinated debt outstanding, then that is the
> basic premise of subordination that, if the senior debt is not
> paid in full, the terms of subordination are that the — the —
> the junior people are giving up their money to the senior to
> the extent that the senior has not been paid in full.  As a
> matter of fact, I mean, as I say, that also Investment
> Banking 101. . . .[114]

Purcell's attention was directed to the so-called "1983 Model Simplified Indenture" issued by an American Bar Association committee (the "Model Form").[115]  To put his testimony into context, it is necessary to examine an earlier product.

In 1971, the American Bar Foundation issued a volume entitled "American Bar Foundation, COMMENTARIES ON INDENTURES."[116]  Article Fourteen provided a form which dealt with subordination of debentures.  In particular § 14-2 provided in part:

> Upon any distribution of assets of the Company upon any
> dissolution, winding up, liquidation or reorganization of the
> Company, whether in bankruptcy, insolvency, reorganization or
> receivership proceedings or upon an assignment for the benefit
> of creditors or any other marshalling of the assets and liabilities
> of the Company or otherwise,

---

[114] Trial Trans. I, 33:23-35:14. (emphasis added).

[115] Ex. 248.

[116] Ex. 247.

(a) the holders of all Senior Debt shall first be entitled to receive payment in full of the principal thereof (and premium, if any) and interest due thereon, or provision shall be made for such payment in cash before the Holders of the Debentures or coupons are entitled to receive any payment on account of the principal of (or premium, if any) or interest on the indebtedness evidenced by the Debentures.[117]

There is no reference to explicitness or any related concept in this language.

In 1983, an American Bar Association committee issued the Model Form. Article 11 contains the following provisions relevant to the issues before me:

**Section 11.01.** ***Agreement to Subordinate***. The Company agrees, and each Securityholder by accepting a Security agrees, that the indebtedness evidenced by the Securities is subordinated in right of payment, to the extent and in the manner provided in this Article, to the prior payment in full of all Senior Debt, and that the subordination is for the benefit of the holders of Senior Debt.

* * *

**Section 11.03.** ***Liquidation; Dissolution; Bankruptcy***. Upon any distribution to creditors of the Company in a liquidation or dissolution of the Company or in a bankruptcy, reorganization, insolvency, receivership or similar proceeding relating to the Company or its property:

(1) holders of Senior Debt shall be entitled to receive payment in full in cash of the principal and interest *(including interest accruing after the commencement*

---

[117] *Id*. at 561 (footnote omitted).

39

> *of any such proceeding)* to the date of payment on
> the Senior Debt before Securityholders shall be
> entitled to receive any payment of principal of or
> interest on Securities. . . .[118]

In the commentary which accompanies the Model Form it is stated:

> The Model Simplified Indenture specifies that priority in right of
> payment will extend to interest accruing on Senior Debt even after
> the commencement of a bankruptcy proceeding.[119]

+-

Purcell testified that while he was aware of the Model Form, he did not

read it "until this case."[120]    However, he does not believe that the addition of

the parenthetical phrase — "including interest accruing after the

commencement of any such proceeding" — added anything beyond what was

understood before; that the additional language is merely repeating.

On cross-examination he made his position even more clear:

Q.    Now do you believe that the words "interest due or to
become due" add anything to the effect of a subordination
clause?

A.    . . . In terms of the general concept of "paid in full" being
sometimes just said, paid in full, and sometimes having ex
— expansionary language, it does not add to that basic
principle.  But it, in terms of expansion of clarity, if you will,
per the '83 Model Indenture recommendations, et cetera, it

---

[118] Ex. 248 at 769 (emphasis added).

[119] *Id*. at 809.

[120] Trial Trans. I, 40:1-8.

40

add the, if you will, including phrase, "more clear", if you
will, than just paid in full. . . it's a clarification expansion, if
you will.[121]

Purcell had heard of the Rule of Explicitness only once in his life prior
to this case,[122] and was familiar with the three cases only as a result of his
work on this case.[123]  And, as he testified:

Q.   . . . your expectation is that in every subordination clause,
regardless if it has language A, B, C, or D, post-petition
interest goes to the seniors before the junior get anything,
correct?

A.   That is correct.[124]

As an equal and opposite expert the Junior Trustees called Gilbert E.

Matthews ("Matthews"), who had a similar number of years experience as an

───────────────────

[121] *Id*. at  68:24-69:14.

[122] *Id*. at  74:9-10.

[123] *Id*. at  74:14-19; 75:3-5.

[124] *Id*. at 82:23-84:2.  He purports to find support for his position in a
law review article footnote which criticizes the three cases.  David Gray
Carlson, *A Theory of Contractual Debt Subordination and Lien Priority*, 38
Vand. L. Rev. 975, 988 n.41 (1985), introduced into evidence as Ex. 71.  I
find the footnote's argument less than persuasive.  Professor Carlson
relies in part on the fact that the Model Form adds the parenthetical
language as reflecting "typical market expectations."  However, he provides
no support for this conclusion, which could as readily represent an intent to
change the law from that reflected in those cases, and we have the
testimony of Mr. Gasden, *infra*, indicating that such was the case.

41

investment banker.[125]   His experience was primarily with subordinated or

convertible issues, because that was the nature of his employer's business.[126]

Matthews' expert opinion was that the investment banking community

understood that senior debt was paid in full when it had received the amount

owed as of the petition date.[127]   While he had not read the three decisions at

that time, "in that time frame, those would have been part of the knowledge

base that the investment community had."[128]   He regarded  Purcell's opinion

as an assumption contrary to the facts known or knowable in the 1980s,[129]

which assumed that "post-petition interest was not payable, absent a specific

provision that — that permitted it. . . ."[130]

I find Purcell's testimony as to this point not credible.  He tries to prove

too much.  I understand that he is not a lawyer, but his view that the senior

debt is entitled to payment in full under all circumstances and without regard

of the wording of any subordinating instrument is inconsistent with the law, the

---

[125] Trial Trans. III, 36:5-13.

[126] *Id*. at 37:22-38:12.

[127] *Id*. at 41:7-18.

[128] *Id*. at 42:18-23.

[129] *Id*. at 47:8-14.

[130] *Id*. at 51:7-17.

42

common law,  the Bankruptcy Act and Bankruptcy Code, as well as common

sense.  As Dr. Suess might have said,

> I meant what I said
> And I said what I meant,
> The Seniors get interest,
> One Hundred Percent!

But, as the Junior Trustees stated in closing argument, "words have

meaning."[131]  I agree.

I find that investment bankers in the 1980s understood that a creditor's

right to interest ceased on the filing of bankruptcy (or, as I have shown, upon

the implementation of other liquidating schemes).  When our unknown drafter

undertook to prepare the Junior Indentures, he or she must be presumed to

have understood that, if BNEC became the subject of a bankruptcy or other

insolvency proceeding, the Senior Debt's right to interest would cease.  It

would have been entirely reasonable for the drafter to assume that the debt

to which the Junior Indentures were to be subordinated was the debt to which

the Senior Indenture holders would be entitled to as a matter of law, the

common law of New York or federal law if the proceedings were in

bankruptcy.  This finding is reinforced by what was going on in the law at the

---

[131] Trial Trans. VI, 69:15.

time.  I will reiterate, briefly, material which appears earlier in this decision.[132]

Time Sales Finance was decided by the Third Circuit in 1974. requiring that the subordination agreement "clearly show" the change from the general rule if such was intended.  It was followed in 1975 by Kingsboro Mortgage from the Second Circuit which held language identical to that now before me "insufficiently express" to create a subordination to post-petition interest.  A third circuit, the Tenth, joined in the next year adopting the rulings of the prior two cases.

Of course these were all cases under the Bankruptcy Act, and we now know that the Bankruptcy Code changed the underlying federal law.    To say that an attorney at a major firm, drafting documents in a multi-million dollar transaction, would ignore three circuit court decisions which (to the best of then knowledge) had a direct impact on an issue involved in the drafting, defies belief.  This is not how talented lawyers practice commercial law.  As one commentator has noted in a parallel area of investment banking:

> Looking once again at the large amounts of money at stake and
> the eminence of the drafting counsel in each bond transaction, it
> safely can be assumed that any judicial allocation of risk seriously
> at variance with expectations of issuers and informed traders
> promptly and explicitly would be overridden in subsequent bond

---

[132] Text at notes 23-36 supra.

contracts.[133]

That override is exactly what the Model Form language proposed to accomplish.

The testimony of James Gadsden ("Gadsden") added substantially to the picture of what was going on in this field in the 1980 period. Gadsden, has been practicing for 34 years and services to corporate trust service providers has been an important part of his practice from the beginning.[134] In the mid-1980s he was active in the American Bar Association Trust Indenture Subcommittee of the Business Bankruptcy committee.[135] The membership of the committee encompassed "the entire spectrum" of lawyers involved in these transactions.[136] He made reports to the subcommittee on current developments,[137] and was familiar with the three cases and the Rule of Explicitness,[138] and "construction of subordination articles was an important

---

[133] William W. Bratton, Jr., *The Economics and Jurisprudence of Convertible Bonds*, 1984 Wis. L. Rev. 667, 718.

[134] Trial Trans. IV, 103:22-104:20.

[135] *Id.* at 108:6-20.

[136] *Id.* at 109:1-19.

[137] *Id.* at 109:20-110:4.

[138] *Id.* at 110:5-13.

topic that we dealt with in this group."[139]  Gadsden testified as follows:

> Q.   So in — in forming your opinion did you review the history
> of interaction between indenture subordination provisions
> and the judicial interprettion of those provisions in the '70s
> and '80s?
>
> A.   Yes, I did.
>
> Q.   And describe the process.
>
> A.   Well, the — the three Court of Appeals decisions were
> uniform and quite — quite — might I say explicit on what
> had to be done.  They — they started from the notion, as I
> — as I mentioned before, that the seniors' entitlement is —
> is their bankruptcy entitlement.  That's — that's what you're
> going to — that's the background and actually the words of
> the document, and that you needed to convey to the person
> who was going to acquire the subordinated debt that the
> rule that interest on the senior indebtedness would cease
> on the bankruptcy case was not going to apply.[140]

When challenged on cross-examination, Gadsden went almost as far

as I have gone in keeping the idea of explicitness alive as a matter of state

law:

> Q.   Well, in the First Circuit those cases — the Rule of
> Explicitness doesn't exist for purposes of the analysis,
> correct?
>
> A.   But it — it — it's my opinion that because of — these —
> these cases cases form the background against which

---

[139] *Id*. at 110:19-21.

[140] *Id*. at 116:18-117:2.

people drafted indentures in the '80s. So they are — they
are still part of what you have to analyze in understanding
what people thought they would accomplish and *would*
accomplish by a choice of words in the 1980s.[141]

It was his opinion that the rule of explicitness was part of New York law

after the adoption of section 510(a) of the Bankruptcy Code.[142] If senior

creditors wanted to obtain post-petition interest, explicit provision would have

to be made, and the quoted language of the Model Form satisfied the need

for that result in the market:

the market wanted seniors to get post-petition interest. . . and so
to deliver that, the [Model Form] . . . gave the express language
to deliver the post-petition interest to the senior indebtedness if
that form of language was adopted.[143]

The second portion of Purcell's testimony actually supports the view

---

[141] *Id*. at 141:22-143:5 (emphasis in original). A contract "is to be
interpreted in accordance with existing judicial decisions as to the law and
not in accord with subsequent judicial decisions." *Brown v. Utica Mut. Ins.
Co.*, 184 Misc. 693, 703, 53 N.Y.S.2d 760, 768-69 (Supr. Ct. 1945).

[142] *Id*. at 151:16-23. One could conclude that the New York Court of
Appeals acknowledged the Rule as part of its common law when it said
that "parties to subordination agreements undoubtedly relied on the
Rule—their lawyers would have been quite remiss had they not. . . ."
Southeast 4 at 184. Respected commentators have done exactly that.
Alan N. Resnick and Brad Eric Scheler, *The Right of a Senior Creditor to
Receive Post-Petition Interest from a Subordinated Creditor's Distributions:
Did the Rule of Explicitness Survive the Enactment of the Bankruptcy
Code?*, 32 U.C.C. L. J. 466, 472 (Spring 2000).

[143] *Id*. at 123:1-5.

that counsel in the 1980s were struggling with the issue.  It involved a survey

which he had caused to be made of other subordinated debt issues of 1984,

1987, and 1989, parallel to the issue dates of the Junior Debt.

A total of 62 issues were identified but copies of only 46 could be

obtained from the SEC.[144]  The documents were introduced into evidence[145]

as was a summary of the applicable language from those documents.[146]

Purcell described the findings, which were that about three different forms of

subordination clauses were in use, some of which utilized explicit language

and some of which did not.  Purcell's conclusion was that the various versions

are "all synonyms described differently for the basic concept that senior debt

had to be paid in full."[147]  I disagree with his conclusion that language is

meaningless.  Mr. Matthews stated the point well:

> Q:    And how was — did you consider whether Mr. Purcell's
>       opinion was consistent with the language of the Junior
>       Indentures?
>
> A.    Well, I think that it — that basically it ignored the language
>       of the Junior Indentures.  To say that all language means

---

[144] Trial Trans. I, 52:17-53:1.

[145] Ex. 79, 80, 82-125.

[146] Ex. 185.

[147] Trial Trans. I, 58:20-22.

48

the same thing, regardless of what it says, I think is inconsistent with anyone's understand[ing] of — of — of what language means.[148]

*Conclusion*

I hold that the drafter of the Junior Indentures, had he or she wished to expand the subordination to include post-petition interest, would have added explicit language to accomplish that end.  That being so, the Senior Trustee has not satisfied me that it is entitled to a dividend from the estate otherwise payable to the Junior Indenture holders.  The Junior Trustees, on the other hand, have convinced me that the language used did not entitle the Senior Trustee to receive the dividend otherwise payable from the estate to the Juniors.[149]  The result is that the Trustee's motion is well taken and an order

---

[148] Trial Trans. III, 47:22-48:4.

[149] That being said, I note that the Junior Trustees failed to demonstrate that including language which satisfies the Rule of Explicitness was part of the custom and practice in the investment banking industry in the 1980s.  To the contrary, all evidence indicates a lack of consistency or uniformity in the drafting of these instruments.

49

will enter granting the Motion for Order Authorizing a Fourth Interim Distribution.


_____
William C. Hillman
United States Bankruptcy Judge


Dated: April 10, 2009

**Counsel Appearing**

*For the Trustee:*
Hugh Ray
Robin Russell
Andrews & Kurth L.L.P.
Houston, Texas

*For HSBC Bank USA:*
Douglas B. Rosner
Goulston & Storrs, P.C.
Boston, Massachusetts
                and
Sarah L. Reid
William A. Escobar
Alison L. MacGregor
Kelley, Drye & Warren, LLP
New York, New York

*For Gabriel Capital, L.P. and Ariel Fund, Ltd.:*
Daniel Zinman
Kasowitz, Benson, Torres & Freedman, LLP
New York, New York

*For Bank of New York Trust Company, N.A.:*
Dianne F. Coffino
C. William Phillips
Jennifer O. Farina
Robert Hemm
Covington & Burling, LLP
New York, New York

*For U.S. Bank, N.A.:*
Patrick J. McLaughlin
Katherine Constantine
Todd Pearson
Dorsey & Whitney, LLP
Minneapolis, Minnesota