**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**
**(EASTERN DIVISION)**

| | | |
|---|---|---|
| **In re:** | § | |
| | § | |
| **Bank of New England Corporation** | § | **Case No. 91-10126 (WCH)** |
| | § | **(Chapter 7)** |
| **Debtor** | § | |

**RESPONSE TO UNITED STATES TRUSTEE'S LIMITED OBJECTION TO FIFTY-THIRD AND FINAL APPLICATION FOR ALLOWANCE OF ATTORNEYS' FEES AND REIMBURSEMENT OF EXPENSES BY ANDREWS KURTH LLP <u>ATTORNEYS FOR THE CHAPTER 7 TRUSTEE</u> (Enhancement)**

Andrews Kurth LLP (the "Applicant" or "Andrews Kurth" or "AK"), general counsel for Dr. Ben S. Branch, Chapter 7 Trustee (the "Trustee") for the Bank of New England Corporation, debtor in this bankruptcy case ("BNEC" or "Debtor"), files this response to (1) the United States Trustee's Limited Objection, and (2) the Junior Indenture Trustees' Omnibus Objection to the Final Fee Applications of AK and the Trustee, as they relate to the enhancements requested by AK and the Trustee. In support, AK shows the Court as follows:

**<u>Introduction</u>**

1. Andrews Kurth is asking for a fee enhancement of $2,488,200.79, representing 10% of its fees for work on three projects, out of many in this long and complicated case, in which its efforts led to truly exceptional results for the BNEC Estate. The Estate was believed by many (including interim Trustee John Whitlock) to be administratively insolvent when Dr. Branch was elected and Andrews Kurth was hired. Andrews Kurth's work allowed the Estate to avoid administrative insolvency and resulted in "vast sums flowing into the Estate"—$164,251,561.05 from the FDIC Litigation and $84,000,000.00 from the E&Y Litigation. *In re Bank of New England Corp.*, 134 B.R. 450, 463 (Bankr. D. Mass. 1991) (indicating that "it

would not be inappropriate for counsel to seek something in excess of its normal rates" in such circumstances). In fact when the E&Y Litigation settled it was, at the time, the largest auditor malpractice recovery in the history of Massachusetts, while the FDIC Litigation was when it settled the most ever recovered from the FDIC in a fraudulent conveyance action.

2. BNEC's Chapter 7 Trustee, Dr. Branch, recognizes that Andrews Kurth's efforts were instrumental in what Judge Richard Stearns said was "a truly remarkable job of marshaling BNEC's assets," and so supports Andrews Kurth's requested enhancement.[1] *In re Bank of New England Corp.*, 295 B.R. 419, 421 (D. Mass. 2003). The U.S. Trustee objects, however, arguing that *Perdue v. Kenny A.*, 130 S. Ct. 1662 (2010), overturned decades of bankruptcy jurisprudence allowing such fee enhancements.[2] The U.S. Trustee also objects, as do the Junior Indenture Trustees, claiming that the results Andrews Kurth obtained "would be expected from a firm of AK's composition and reputation," so that they are not the truly exceptional results required for an enhancement.[3] Both objections are misplaced. The Court can and should award Andrews Kurth its requested enhancement. Likewise, the Court should award the $1,272,561.69 requested fee enhancement for BNEC's Trustee, which amount represents a 13% enhancement over his hourly rates, for his "truly remarkable job" in this case. 295 B.R. at 421.

## Argument

### A. The Chapter 7 Trustee supports all compensation requested by AK

3. The Chapter 7 Trustee acts in a capacity similar to that of a board of directors, exercising his business judgment in determining what is in the best interest of the estate. *See In*

---

[1] Branch Aff., Ex. 9, ¶ 3.

[2] *See* Limited Objection, Dkt#2506, at ¶ 15.

[3] *Id.* at ¶ 23.

*re Am. Cartage, Inc.*, 656 F.3d 82, 92 (1st Cir. 2011) (noting that the trustee is "entrusted to marshal an estate's assets and liabilities, and proceed in settling its accounts on whatever grounds he, in his informed discretion, believes will net the maximum return for the creditors (on whose behalf he toils)," so that "his judgment is entitled to some deference").

4. In its first fee opinion, *In re Bank of New England Corp.*, 134 B.R. 450 (Bankr. D. Mass. 1991), the Court disallowed certain fees and expense items on an interim basis but held out the possibility of an enhancement. That possibility incentivized both the Trustee and AK to attempt the extraordinary. Now that the extraordinary has been achieved, the Trustee fully supports all compensation requested by AK, including the 10% enhancement.

### B. *Perdue* does not address, much less change, the jurisprudence allowing fee enhancements in bankruptcy cases

5. The *Perdue* case the U.S. Trustee relies upon in opposing enhancement is not a bankruptcy case. The question it addresses is a narrow one: "whether the calculation of an attorney's fee, ***under federal fee-shifting statutes***, based on the 'lodestar' . . . may be increased due to superior performance and results." 130 S. Ct. at 1669 (emphasis added). The Court relied solely on its prior fee-shifting jurisprudence to support its holding, and neither explicitly touched on bankruptcy law—the opinion does not even mention the word "bankruptcy"—nor indicated that it intended *Perdue* to extend to non-fee-shifting cases. In particular, *Perdue* says nothing about section 330 of the Bankruptcy Code, which is ***not*** a fee-shifting statute and under which Andrews Kurth seeks enhancement. *See CEH, Inc. v. F/V Seafarer*, 70 F.3d 694, 702 (1st Cir.

1995) ("[W]e are hesitant to ascribe to the [United States Supreme] Court a holding that goes well beyond any issue discussed there.").[4]

6. *Perdue* involved a class action lawsuit by children in the Georgia foster care system against the Governor of Georgia and various state officials, alleging violations of constitutional and statutory rights. 130 S. Ct. at 1669. The plaintiffs reached a favorable settlement and their attorneys sought to recover their fees from the defendants under 42 U.S.C. § 1988. *Id.* at 1670; *see* 42 U.S.C. § 1988 ("[T]he court, in its discretion, may allow the prevailing party . . . a reasonable attorney's fee as part of the costs"). The district court calculated a $6 million lodestar figure and then enhanced the award by 75%. *Id.* The Supreme Court remanded the case because the district court "did not provide proper justification for the large enhancement it awarded." *Id.* at 1675.

7. "The [*Perdue*] Court held that only the following three rare and exceptional circumstances could justify a fee enhancement based on superior performance: (1) when 'the hourly rate employed in the lodestar's calculation does not adequately measure the attorney's true market value'; (2) 'if the attorney's performance includes an extraordinary outlay of expenses and the litigation is exceptionally protracted'; and (3) when there is an 'exceptional delay in the payment of fees,' especially 'where the delay is unjustifiably caused by the defense.'" *CRG Partners Group, L.L.C. v. United States Trustee (In re Pilgrim's Pride Corp.)*, 690 F.3d 650, 663 (5th Cir. 2012) (quoting *Perdue*, 130 S. Ct. at 1674–75). *Perdue*'s holding "was founded primarily upon justifications that are unique to cases governed by § 1988 or other

---

[4] *See also CRG Partners, L.L.C. v. United States Trustee (In re Pilgrim's Pride Corp.)*, 445 B.R. 667, 672 (N.D. Tex. 2011), *aff'd*, 690 F.3d 650 (5th Cir. 2012) (holding that *Perdue* did not prevent enhancement under the Bankruptcy Code, and observing that "[i]t is one thing for a court to seek guidance from a case decided in a different context; it is another thing entirely for a court to allow such a case to displace its previously established precedent").

fee-shifting statutes." *Id.* The second and third circumstances, for example, arise in § 1988 because "attorneys in fee shifting cases generally understand that they will not receive attorney's fees or expense reimbursements until the end of a case." *Id.* (citing *Perdue*, 130 S. Ct. at 1674–75). Fees awarded under § 1988 cases are also atypical because, in many cases, they "are not paid by the individuals responsible for the constitutional or statutory violations on which the judgment is based," but are "paid in effect by state and local taxpayers, and because state and local governments have limited budgets, money that is used to pay attorney's fees is money that cannot be used for programs that provide vital public services." *Perdue*, 130 S. Ct. at 1676–77 (footnote omitted). The governing law and relevant circumstances are quite different in bankruptcy cases. *See In re Mkt. Ctr. E. Retail Prop., Inc.*, 469 B.R. 44, 53 (10th Cir. BAP 2012) ("There are significant differences between fee awards in civil rights actions and bankruptcy cases").[5]

8. Unlike 42 U.S.C. § 1988, which "does not explain what Congress meant by a 'reasonable' fee," section 330 provides specific considerations (*i.e.*, the nature, extent, and value of the services) and six factors for bankruptcy courts to consider when determining a reasonable fee. *Perdue*, 130 S. Ct. at 1671; *see* 11 U.S.C. § 330(a)(3). Section 330 also indicates that its list of factors is not exclusive: courts may consider "all relevant factors." *Id.* "This differs markedly from the near ubiquitous application of the lodestar in fee-shifting cases, as, in those cases, the lodestar 'figure includes most, if not all, of the relevant factors constituting a reasonable attorney's fee.'" *In re Pilgrim's Pride Corp.*, 690 F.3d at 665 (quoting *Perdue*, 130 S. Ct. at 1673).

---

[5] *See also Hardt v. Reliance Stand. Life Ins. Co.*, 130 S. Ct. 2149, 2157 (2010) ("caution[ing] courts conducting statutory interpretation not to apply rules applicable to one statute to another statute without careful and critical examination") (citations and internal quotations omitted).

9. The source of the section 330 fee enhancement also differs markedly. "Unlike cases under § 1988, where fee enhancements often come at the expense of the taxpayer, the public's purse is left untouched in bankruptcy proceedings." *Id.* at 666. Here, only the Estate's bottom-line to creditors (who have already received many times what they ever expected to recover in this estate and many times what they paid for the bonds) will be reduced by AK's requested enhancement. Recovery in the § 1988 fee shifting realm "necessarily involves the redistribution of a finite sum of money from the pocket of the adversary into the hands of the prevailing party." *Id.* The Supreme Court has at least twice refused to extend its fee-shifting doctrine to other statutes that—like section 330 of the Bankruptcy Code—do not have a "prevailing party" component. *See Hardt*, 130 S. Ct. at 2155–57 (holding that "[o]ur 'prevailing party' precedents . . . do not govern the availability of fee awards under § 1132(g)(1) [of ERISA], because this provision does not limit the availability of attorney's fees to the 'prevailing party'") (citations omitted); *Gisbrecht v. Barnhart*, 535 U.S. 789, 802 (2002) (declining to apply fee-shifting rules to fees under the Social Security Act, because the Act "is of another genre: It authorizes fees payable from the successful party's recovery"). Section 330 is similarly of a different "genre."

10. Federal fee-shifting statutes like 42 U.S.C. § 1988 were not "intended to replicate exactly the fee an attorney could earn through a private fee arrangement with his client. Instead, the aim of such statutes was to enable private parties to obtain legal help in seeking redress for injuries resulting from the actual or threatened violation of specific federal laws." *Penn. v. Delaware Valley Citizens' Council for Clean Air*, 478 U.S. 546, 565 (1986) (*Delaware Valley I*). Hence, if plaintiffs "find it possible to engage a lawyer based on the statutory assurance that he will be paid a 'reasonable fee,' the purpose behind the fee-shifting statute has been satisfied." *Id.*

11. In contrast, section 330 of the Bankruptcy Code ***was*** intended "to compensate attorneys and other professionals serving in a case under title 11 at the same rate as the attorney or other professional would be compensated for performing comparable services other than in a case under title 11." H.R. Rep. No. 95-595, 95th Cong., 1st Sess. 329–30, reprinted in 1978 U.S.C.A.A.N. 5963, 6442. Before adoption of the Bankruptcy Code in 1978, "[t]he economic spirit of the Bankruptcy Act demand[ed] that an attorney be paid in bankruptcy matters an amount appreciably ***less*** than he could command for similar services in purely private employment." *Jacobowitz v. Double Seven Corp.*, 378 F.2d 405, 407 (9th Cir. 1967) (emphasis added).[6] Public policy in bankruptcy cases shifted in 1978, when Congress enacted the Bankruptcy Code. With section 330, Congress deliberately departed from notions of conserving the estate and economy of administration that prevailed under the Bankruptcy Act. The Bankruptcy Code is designed to mimic a private transaction outside bankruptcy court, and so favors compensating professionals commensurate with what they can earn outside bankruptcy—including bonuses for truly exceptional results. Fee-shifting statutes have no such legislative history or purpose.

12. Neither *Perdue* nor any other authority overrules the precedent in the First Circuit and others which allows fee enhancement under section 330 of the Bankruptcy Code for professionals, like Andrews Kurth, that "transfor[m] a carcass into a cheetah, so to speak, thereby enlarging the pie that is shared by all of the debtor's creditors." *In re Pilgrim's Pride Corp.*, 690

---

6 *See* 3 COLLIER ON BANKRUPTCY, ¶ 330.LH[3] (15th ed. rev. 1999) (discussing § 64(a)(l) of the Bankruptcy Act of 1898 and Bankruptcy Rule 219(c)(1), which provided for reasonable compensation for services rendered in the administration of a bankrupt estate giving due consideration to "the nature, extent, and value of the services rendered as well as to the conservation of the estate and the interests of creditors").

F.3d at 666 (affirming a $1 million enhancement on a $5.98 million fee).[7] The record shows that Andrews Kurth played a key role in working such a transformation with BNEC.

**B. Enhancement should be awarded here for Andrews Kurth's exceptional results**

***1. The U.S. Trustee's limited objection provides no basis to deny enhancement***

13. The Final Application establishes (and the BNEC Trustee agrees) that Andrews Kurth obtained exceptional results for the BNEC Estate in the three projects for which enhancement is sought. The U.S. Trustee does not offer substantive argument or evidence to the contrary; instead, it argues that such results are to be expected of Andrews Kurth and so are built into its customary rates.[8] But enhancement is simply "another way to assure that the professional is appropriately compensated (without being overcompensated), in light of the circumstances. Seen in this way, enhancement is not a bonus, but merely another way to arrive at a comparable rate." *In re El Paso Refinery, L.P.*, 257 B.R. 809, 837 (Bankr. W.D. Tex. 2000) (discussing *In re Apex Oil Co.*, 960 F.2d 728, 732 (8th Cir. 1992)). Indeed, considering enhancement "may be the only fair way to truly evaluate fees in bankruptcy cases, because the process of bankruptcy is such that the real value of services will often not be realized until the conclusion of the case." *Id.*

---

7 *See also In re Heise*, 436 B.R. 143, 149 (Bankr. D.N.M. 2010) (declining to extend *Perdue* to chapter 13 case, and noting that "[o]ther than the commonality of the lodestar as the subject of *Perdue* and of this case, which commonality arises from the fact that the lodestar methodology for calculating fees became commonplace after the practice of hourly billing had become widespread, the holding in *Perdue* is irrelevant for [the court's] inquiry"); *In re Farah*, 141 B.R. 920, 929 (Bankr. W.D. Tex. 1992) ("That bankruptcy courts use (indeed are constrained to use, under principles of stare decisis) the same general standards for evaluating fees in bankruptcy cases as do courts in setting fees in fee-shifting cases does not require those courts to employ the same methodology for setting an enhancement award.").

8 The U.S. Trustee also vaguely asserts that "the case's 2,500 docket entries suggest AK can claim neither sole nor primary credit for the results obtained in this case, such as they are." Limited Objection, Dkt#2506, at ¶ 23. Andrews Kurth has never claimed to have achieved the notable outcomes in this case all by itself. Nonetheless, the docket shows that the tax strategy Andrews Kurth devised saved the Estate from administrative insolvency. The dockets in the Massachusetts Federal District Court litigations against E&Y and the FDIC demonstrate that AK is entitled to credit for the litigation strategy and legal efforts that brought the FDIC and E&Y Litigations to extraordinarily successful conclusions. AK asks the Court to take judicial notice of the docket sheets for the FDIC and E&Y Litigation, which are attached as exhibits 7 and 8.

at 837 n.54 (awarding enhancement in case where attorneys traveled to and from Houston without being fully reimbursed, the debtor was originally thought administratively insolvent, and the case lasted six years, much longer than anyone anticipated at the outset).[9]

14. The U.S. Trustee argues that this case is similar to *In re Molten Metal Technology, Inc.*, 345 B.R. 26 (Bankr. D. Mass. 2006), in which the court granted compensation without a $400,000 premium. However, the law firm in *Molten Metal* sought enhancement as a percentage of its entire lodestar fee, and its request was based on funds being "available for a five percent distribution to general unsecured creditors where at the outset there was a $20 million administrative insolvency." *Id.* at 28. In this case, however, Andrews Kurth has ***not*** asked for enhancement for all of its successful work in this case. The three projects for which Andrews Kurth seeks enhancement involved the very highest legal, economic, strategic, and tactical barriers to recovery, and the results Andrews Kurth obtained were far beyond the ordinary expectations of even the most competent of law firms. Not only did BNEC avoid administrative insolvency and a large tax claim because of the strategy AK devised and implemented, but the Estate ultimately:

- Paid its senior bondholders in full;
- Collected $374,687,361.56 in gross receipts from asset sales, liquidation of subsidiaries, litigation recoveries, and management of cash prior to distribution (including $248,251,561.05 combined from the FDIC and E&Y Litigations, or 66% of the total);

---

[9] The *El Paso Refinery* court noted that fees are typically awarded during the course of a case "on an interim basis using precisely the same standard of 'reasonable and necessary' as is used to make final fee awards. Thus a lodestar is *de facto* developed over the course of the case. Only at the end of the case, however, will a court be able to see whether that lodestar was in fact too low . . ." 257 B.R. at 837 n.54.

- Made a distribution of ***36.8%*** to unsecured creditors, with an anticipated final distribution as reflected on the Trustee's Final Report of ***37.77%*** (if AK's enhancement were denied—and it should not be—recovery to unsecured creditors would be 38.03%, a difference of only 0.26%); and

- Distributed over $74 million to the Junior Indenture Trustees.

This is far more success than the claimant achieved in *Molten Metal*.

***2. AK obtained these exceptional results at below-market rates***

15. Andrews Kurth also obtained these successes in the E&Y Litigation and FDIC Litigation at rates below those charged by its direct peers—the defense counsel for E&Y and the FDIC.

16. E&Y was represented by the New York office of Davis Polk & Wardwell ("DP&W"). The Ernst & Young case settled in 2005. Attached as Exhibit 3 is the "Fifth and Final Application of Davis Polk & Wardwell for Final Allowance of Compensation and Reimbursement of Expenses" filed in *In re Delta Airlines, Inc., et. al* No. 05-17923 in the U.S. Bankruptcy Court for the Southern District of New York for September 14, 2005 through March 31, 2007, a period commencing shortly after the E&Y Litigation settled. Included in the list of time keepers is the Davis Polk & Wardwell litigation partner, Frances E. Bivens, who managed the day-to-day tasks of litigation. Jim Higgason performed the same role for the Trustee. As shown in the comparison of rates below, Ms. Bivens' rate was between $235 and $320 more per hour than that charged by Mr. Higgason. The DP&W rates are similarly higher for other attorneys. Furthermore, DP&W out-staffed AK on the E&Y Litigation by almost three to one.

| DP&W Attorney | DP&W Admission Year | DP&W Rate 2005-2007 | AK Rate 2005-2007 | AK Admission Year | AK Attorney |
|---|---|---|---|---|---|
| James Benkard<br>John Fowley | 1963<br>1974 | 835<br>785-890 | 580-715 | 1967 | Hugh Ray |

| DP&W Attorney | DP&W Admission Year | DP&W Rate 2005-2007 | AK Rate 2005-2007 | AK Admission Year | AK Attorney |
|---|---|---|---|---|---|
| Karen Wagner | 1977 | 785-890 | | | |
| Jeffrey Dakes<br>Sharon Katz | 1980<br>1982 | 775<br>705-835 | 475-525 | 1980 | Larry Schreve |
| Danforth Townley<br>Lawrence Wiseman | 1986<br>1986 | 860<br>835 | 530-620 | 1986 | Robin Russell |
| Francis Bivens<br>Lawrence Portnoy | 1993<br>1989 | 735<br>835 | 415-500 | 1989 | Jim Higgason |
| Benjamin Kaminetskey | 1994 | 630-780 | 350-430 | 1994 | Kendall Gray |
| Andrews Dean<br>Phineas Leachey | 2002<br>2003 | 445-530<br>460 | 235-325 | 2001 | Kelly Sandill |
| Candy Lawson | 2003 | 460-530 | 180-270 | 2003 | Georgia Adams |

17. Likewise, Andrews Kurth's rates were below those of many of their peers in the FDIC Litigation. In the beginning, the lead defense attorney in the FDIC litigation was Deborah Griffin of the Boston firm of Peabody & Arnold ("P&A"). P&A covered the depositions in the FDIC Litigation, typically with three attorneys present—a P&A partner, a P&A associate, and an FDIC in-house attorney. However, as AK continued to succeed in its efforts to move the case to trial, the FDIC engaged the New York firm of Sullivan & Cromwell ("S&C"). The S&C high-powered team included litigation partner Robinson Lacy, former law clerk to U.S. Supreme Court Chief Justice Warren Burger, and partners Michael Wiseman, and H. Rodgin Cohen, leading experts in banking and financial institutions law. While AK does not have access to the rates S&C charged in the period it represented the FDIC against BNEC, for reference AK attaches as Exhibit 1 the fee application filed by S&C this year in *In re Eastman Kodak Company* from which one can see the relativity of S&C rates to AK rates. Sullivan & Cromwell partner billing rates range from $990 to $1,150, with Restructuring & Bankruptcy section partners Rebecca Simmons (admitted 1991) and Erik Lindauer (admitted 1995) charging $990

per hour. This compares to Robin Russell (admitted 1986) charging $795 per hour. Likewise, S&C associate billing rates range from $395 to $850 as compared to AK Texas associate rates ranging from $265 to $530. Thus, not only did AK obtain exceptional results, it did so at below market rates.

18. The same comparison holds true with respect to the Estate's counterparty lead professionals in the Postpetition Interest Dispute. Based on publically filed fee applications in other cases or bills submitted to the BNEC Trustee, for example, the lead attorney for other constituent groups in the Prepetition Interest Dispute billed between $80 and $125 more per hour than Andrews Kurth's counsel[10]:

| **Attorney, Firm (Party Represented)** | **Admission** | **Rate/Year** |
|---|---|---|
| David Retter, Kelly Drye Warren (Senior Indenture Trustee) | 1980 | $920.00 (2011) |
| Dianne Coffino, Covington & Burling (Junior Indenture Trustees) | 1989 | $890.00 (2012) |
| David Rosner, Kasowitz Benson Torres & Friedman (Jack Mayer, the largest senior bondholder) | 1990 | $875.00 (2012) |
| **Robin Russell, Andrews Kurth (Trustee)** | **1986** | **$795.00 (2012)** |

### 2. *The Junior Indenture Trustees' objection provides no basis to deny enhancement either*

19. Like the U.S. Trustee, the Junior Indenture Trustees do not dispute that the Estate received "extensive services at a consistently excellent standard" from Andrews Kurth.[11] The Junior Indenture Trustees argue, however, (a) that AK did not engage in "exceptional activity *beyond that* reasonably contemplated at the time of the original retention," (b) that Andrews

[10] *See* Ex. 4.

[11] Omnibus Objection, Dkt#2513, at ¶ 11.

Kurth did not face a significant risk of nonpayment, and (c) that enhancement is reserved for cases where all creditors have been paid in full.[12]

**(a) AK engaged in exceptional activity that was not reasonably contemplated when it was retained**

20. The Junior Indenture Trustees' first argument is both ironic and wrong. Nobody foresaw just how different BNEC's Chapter 7 proceeding would be from the First Republicbank Corporation Chapter 11 proceeding—the experience that was in large part the reason for the Trustee's election and Andrews Kurth's retention. The ultimate magnitude of the BNEC project, and that it would last ***21 years***, was unanticipated by anyone when it first began.[13] Andrews Kurth notes that ***none*** of the cases the Junior Indenture Trustees cite as support for denying enhancement involves the administration of a multi-decade case like this one; many of them lasted three years or less.[14]

21. First Republicbank filed for Chapter 11 bankruptcy protection on July 31, 1988, in the United States Bankruptcy Court for the Northern District of Texas with $33.4 billion in assets. At the time of its filing it held the dubious distinction of being the largest FDIC-insured banking organization ever to fail. AK represented the Official Committee of Unsecured Creditors (the "Committee") in the Chapter 11 proceeding, and Dr. Branch ultimately became the

---

[12] Omnibus Objection, Dkt#2513, at ¶ 9 (citation omitted; emphasis in original).

[13] That an engagement this lengthy precluded AK's attorneys from accepting other work cannot be doubted. An affidavit from Robin Russell detailing some of the personal and professional costs of the engagement was previously filed under seal, and is incorporated for all purposes as Exhibit 6 to this response.

[14] *See In re Molten Metal Tech., Inc.*, 345 B.R. at 27-28 (less than 10 years); *In re Nucentrix Broadband Networks, Inc.*, 314 B.R. 574, 576-77 (Bankr. N.D. Tex. 2004) (less than 1 year); *Meronk v. Arter & Hadden, LLP (In re Meronk)*, 249 B.R. 208, 210-12 (BAP 9th Cir. 2000) (approximately 3 years); *Johnson, Blakely, Pope, Bokor, Ruppel & Burns, P.A. v. Celotex Corp. (In re Celotex Corp.)*, 232 B.R. 484, 486 (M.D. Fl. 1998) ("approximately seven years"); *In re First Am. Healthcare of Ga., Inc.*, 212 B.R. 408, 414 (Bankr. N.D. Ga. 1997) (less than 1 year); *In re U.S. Lines, Inc.*, 103 B.R. 427, 427 (Bankr. S.D.N.Y. 1989) (approximately 3 years); *In re Energy Coop., Inc.*, 95 B.R. 961, 962 (Bankr. N.D. Ill. 1988) (7 years).

Committee's chairman. In 1990, ***less than 2½ years*** after the case was filed, a plan of reorganization, supported by the Committee, was confirmed over the objection of the FDIC and the effective date was stayed pending appeal. AK and Dr. Branch negotiated a global settlement with the FDIC while the case was on appeal. On the effective date, Dr. Branch became chairman of the board of the liquidating corporation.[15] All remaining assets, including causes of action, were liquidated and/or resolved by the end of 1991.[16] The BNEC project, in contrast, was a Chapter 7 "free fall" filed by the BNEC board as demanded by the FDIC. It came to the Chapter 7 Trustee with limited cash, no employees, no institutional knowledge and significant tax exposure. The import of these distinctions was not fully realized in March 1991.

22. When the FDIC seized BNEC's subsidiary banks on January 6, 1991, it directed BNEC's board to file a Chapter 7 bankruptcy petition.[17] In previous major bank holding company bankruptcies, including those of First Republicbank Corporation and MBank, the directors filed Chapter 11 petitions which allowed for a more orderly process. As a result of the Chapter 7 filing, BNEC had no employees and no directors, *i.e.*, there was basically no one from whom to seek institutional knowledge without going through the lengthy and complicated discovery process. The lone exception was Richard Holbrook, BNEC's former Controller, who was made available for the sole purpose of testifying at the Section 341 meeting on behalf of the Debtor. Upon seizure of the banks, the FDIC immediately either fired or hired into the Bridge Banks all BNEC employees. The FDIC also provided indemnifications to a key group of

---

15 *See* Branch Aff., Ex. 9.

16 The settlement provided sufficient funds to allow payment to senior bondholders of 100% of their pre-petition claims. Junior bondholders received a payout in the range of 13%.

17 AK asks the Court to take judicial notice that the BNEC directors testified in the D&O Litigation and FDIC Litigation that the regulators specified that BNEC must file a Chapter 7.

BNEC's directors for any actions they took to benefit the banks to the detriment of BNEC. It took years of fighting before the FDIC fully turned over BNEC's own documents to the Trustee.

23. For example, following the Chapter 7 filing the Trustee and his accountants (BDO Seidman) were allowed limited access to personnel in the accounting department for the purpose of attempting to prepare BNEC tax returns and reports. But, as explained in the affidavit of Nancy Palazzolo (attached as exhibit 11), the Bank of New England, N.A.'s former payroll tax manager, the BNEC employees hired by the Bridge Banks were instructed to not assist or be cooperative with the Chapter 7 Trustee or his representatives. Andrews Kurth took exceptional action to remedy this deprivation of institutional knowledge and facilitate significant estate recoveries.[18] In particular, Van Oliver, the AK attorney who questioned Mr. Holbrook at the Section 341, later engaged him in conversation, ultimately convincing him to go for a drink. Mr. Oliver learned that Mr. Holbrook was looking for work and a means of supporting his wife and two small sons. The BNEC Estate had no economic justification for hiring someone at Mr. Holbrook's level, but shortly thereafter Mr. Oliver was appointed the liquidating trustee under the plan of reorganization for BankEast of Manchester, New Hampshire. In that role, Mr. Oliver was in a position to hire someone with Mr. Holbrook's credentials and experience and chose to do so. Mr. Holbrook did an excellent job in his BankEast role. Mr. Oliver's move to hire Mr. Holbrook ultimately allowed AK access to Mr. Holbrook and his wealth of institutional knowledge with respect to BNEC.

24. Andrews Kurth attorneys also spent a great deal of non-billable time and incurred many non-reimbursable expenses meal establishing rapport with former BNEC employees and—

---

[18] *See generally* Russell Aff., Ex. 12.

after the FDIC Litigation settled—former regulators, to facilitate the flow of factual information and, in some instances, ultimately convince them to testify for the Trustee in the E&Y Litigation.[19] For example, after numerous phone calls, Jim Higgason convinced Vivian Cook, a former employee of the Office of the Comptroller of the Currency ("OCC"), to allow him to come interview her on her farm in rural Pennsylvania. Mr. Higgason was ultimately able to convince Ms. Cook to come to Boston to testify in the E&Y Litigation about what she had found when she went into the BNEC banks in 1989, as leader of the OCC examination team.[20] Although AK and the Trustee had experienced aggressive litigation tactics in First Republicbank, such as constant objections to fee applications, the time it took to gather facts in the BNEC Chapter 7 in the face of affirmative efforts of the FDIC to prevent their discovery, and to convince experts to serve as witnesses, was never anticipated. Resolution of the BNEC Estate's disputes with the FDIC and E&Y took at least three times as long as that in the First Republicbank bankruptcy.

25. As detailed as pages 122-141 to AK's fee application, the E&Y Litigation was extremely hard-fought, involving multiple dispositive motions. AK successfully defeated E&Y's repeated efforts to avoid a trial before a Boston jury. While these types of battles are common and to be expected in high-stakes litigation, AK's efforts were exceptional due to the budgetary (and thus staffing) constraints resulting from the fact that they represented a Chapter 7 Trustee. AK's results—the then highest recovery in an accounting malpractice case in Massachusetts—

---

19 *See generally* Russell Aff., Ex. 12.

20 Similarly, Robin Russell convinced Professor Joseph Sinkey, a tenured professor of banking regulation at the University of Georgia who, as an academician had studied the causes of the failure of BNEC's banking system, to allow her to come visit him in Athens, Georgia to discuss BNEC. The BNEC Estate ultimately was able to hire Professor Sinkey to serve as an expert witness in the Estate's litigation. *See* Russell Aff., Ex. 12, ¶ 8.

were also exceptional. But beyond these facts there was at least one "game-changing" event not fully explained in AK's application that is further evidence an enhancement is justified.

26. The event occurred early in the E&Y Litigation.[21] Andrews Kurth sought to identify and retain an accounting malpractice expert witness, but experienced great difficulty in finding one. Andrews Kurth was repeatedly advised that no "big accounting firm" would testify against another "big accounting firm" like E&Y, that most, if not all, accounting malpractice carriers prohibited anyone covered by a policy from testifying against another accountant in a malpractice suit, and that many academics were discouraged by their respective universities from testifying against any accounting firm that hired the schools' graduates or that gave money to the school. This ***severely*** limited the pool of potential experts. However, through the tenacity and connections of now-retired AK partner Walter Stratton, AK was able to convince Douglas R. Carmichael, a chaired professor of accountancy at the Zicklin School of Business at Baruch to work with the firm on the E&Y Litigation.[22] Although an expert in his field, Professor Carmichael had very limited experience serving as an expert witness. During the trial, held 14 years after BNEC failed, Professor Carmichael testified—powerfully—that E&Y had been extremely negligent in its auditing of BNEC. The next day, E&Y's general counsel approached Robin Russell to resume settlement discussions.[23]

---

21 *See* Russell Aff., Ex. 12, ¶¶ 9-11.

22 After the role of the accounting firm Arthur Andersen in the December 2001 failure of Enron became known, the federal government created the Public Oversight Board and selected Professor Carmichael as its Chief Auditor, a position many viewed as the highest honor the government could bestow upon an auditor. Shortly after Professor Carmichael's appointment, E&Y's counsel threatened to move to disqualify Professor Carmichael. A stipulation was ultimately negotiated which allowed Professor Carmichael to testify but prevented AK from informing the jury of his position. *See* Russell Aff., Ex. 12, ¶ 10.

23 Ms. Russell's credibility and experience, and the relationship she established with Kathryn Oberly, E&Y's general counsel, were also instrumental in facilitating the settlement offers made by E&Y to the Trustee. As mentioned in paragraph 380 of Exhibit 2 of the Application, Robin Russell was approached by Ms. Oberly on

27. Additionally, no one foresaw the ten year battle between the Junior and Senior bondholders over "vast sums" of money which existed only as a result of an extraordinary litigation effort on the part of the Trustee and AK. As a result of this drawn-out battle, $15,791,248.00 has been paid to or reserved for the Indenture Trustees' legal and trustee fees and expenses—more than half the amount on which AK seeks it enhancement ($24,881,300.79).[24]

---

the third day of trial. *See* Ex. 9-B at ¶ 380. They spent that morning in settlement discussions, during which Ms. Oberly consistently advanced the position that E&Y's liability would be limited to the amount it received from BNEC in fees for the bad audit years, rather than the $173,820,000 which BNEC had "down streamed" to its subsidiary banks following a September 1989 bond issuance. Ms. Russell advanced the Trustee's argument that "but for" E&Y's negligence, the bond proceeds never would have been down streamed. Several days later, E&Y gave Ms. Russell an offer significantly higher than any previously received. The case was ultimately settled for $84 million. *See* Russell Aff., Ex. 12, ¶ 12. Obviously, many people were involved in preparing the E&Y case for trial, and presenting an opening statement and evidence which compelled E&Y back to the settlement table. Notwithstanding, AK submits that the relationship Ms. Russell established with Ms. Oberly was key to the settlement.

[24] $15,791,248.00 in fees and expenses has been charged against distributions made by the Estate to bondholders. This amount is more than AK received for representing the Trustees in the E&Y Litigation.

Attached as Exhibits 10-1 through 10-3 are the notices sent by the Junior Indenture Trustees to the three subordinated bondholder groups in connection with the fourth distribution. The accrued fees and expenses and the reserve for the future fees and expenses as reflected therein are set forth below:

| | |
|---|---|
| 8 ¾% Notes | |
| Fees and Expenses to 10/21/11 | $4,014,061.37 |
| Reserve | $727,000.00 |
| | $4,741,061.37 |
| Floating Rate Notes | |
| Fees and Expenses to 10/21/11 | $1,555,961.73 |
| Reserve | $273,000.00 |
| | $1,828,861.73 |
| 9 ⅞% Notes | |
| Legal Fees | $4,719,789.70 |
| Reserve | $538,086.50 |
| Trustee Fees | $163,450.70 |
| | $11,991,248.00 |
| With respect to the expenses and fees of the Senior Indenture Trustees, all legal fees were paid in full current through the Third Interim Distribution, and a $600,000 reserve was paid. | |
| Reserve | $600,000.00 |
| Settlement | $3,200,000.00 |
| | $3,800,000.00 |

Jack Mayer, the majority holder of Senior Bonds indemnified the Senior Indenture Trustee for the remainder.

28. Andrews Kurth took other exceptional actions, including, for example, Robin Russell's onsite presence in Boston from within two weeks of the Trustee's election until the FDIC litigation was settled ***seven years*** later. When the Trustee's one year leave of absence from the University of Massachusetts at Amherst ended in September 1992, Ms. Russell worked onsite so that the Trustee could return to his full time faculty position at the University. Ms. Russell also took exceptional action in connection with a formal mediation of the E&Y Litigation in December 2004. As with the FDIC mediation, Ms. Russell made the Trustee's multi-hour mediation presentation. A component of that presentation focused on the likely reaction of a Boston jury to the Trustee's theory in light of its likely socioeconomic makeup and recent events (*e.g.*, the failure of Enron in December 2001). Financial constraints limited the Trustee's ability to hire a jury consulting firm to conduct multiple mock trials, as would have been customary in a case the size of the E&Y Litigation. But Ms. Russell, over many months, on her own time and at her own expense, educated herself as to the leading views on jury psychology and selection.

29. The cases cited by the Joint Indenture Trustees provide yet more support for concluding that Andrews Kurth did engage in exceptional activity for the Estate:

- In *In re Public Service Co. of New Hampshire*, 160 B.R. 404, 420 (Bankr. D.N.H. 1993), a financial advisor was awarded an enhancement where he "served as the primary negotiator for a sale of the debtor's assets." Here, litigation recoveries were the only path to a substantial recovery for the Estate's creditors. Hugh Ray served as primary negotiator of the FDIC Litigation and Robin Russell served as the primary negotiator of the settlement of the E&Y Litigation. *See supra* note 16.

- In *In re Morris Plan Co of Iowa*, 100 BR 451 (Bankr. N.D. Iowa 1989), counsel used political connections to expedite an administrative review. An analogy can be drawn to Robin Russell's decision to pursue an L.L.M. in Banking Law Studies at Boston University, at her own expense and on her own time, so that she could take a class taught by Andrew Granger, knowing that as head of Recoll Management he was overseeing the liquidation of the bad loan portfolio of BNEC's former subsidiary bank, Bank of New England N.A., and that those loans would be critical in the valuation of BNENA in the FDIC Fraudulent Conveyance Litigation.

- In *In re WHET, Inc.* 61 BR 709, 717 (Bankr. D. Mass. 1986), a firm was awarded an enhancement when it overcame abusive behavior of the former principal of the debtors. Here, Andrews Kurth expended significant time and effort dealing with the obstreperous behavior of the FDIC, the Federal Reserve Board, and the Office of the Comptroller of the Currency, while simply trying to obtain BNEC's ***own*** documents in discovery, not to mention verbal abuse from the lead in house counsel at the FDIC. *See supra* ¶¶ 23-24.

In this case, the duties AK performed were not only exception, they were also materially greater than the duties contemplated when first engaged.

**(b) AK did face significant risk of nonpayment**

30. The Junior Indenture Trustees' second argument, that Andrews Kurth did not face significant risk of nonpayment, is also belied by the record.

31. The Junior Indenture Trustees accuse Andrews Kurth of "confus[ing] the risk of nonpayment with the need to reduce illiquid assets to cash."[25] The Junior Trustees' assertion that AK "faced no initial risk of nonpayment" because "[u]pon commencement of the case, on January 7, 1991, the estate held assets totaling $941,487,058.59, of which over $30 million consisted of cash in subsidiary accounts," represents a fundamental misunderstanding of BNEC's capital structure and the challenges faced by the AK and the Chapter 7 Trustee.[26] As set forth in

---

[25] Omnibus Objection, Dkt#2513, at ¶ 15.

[26] Omnibus Objection, Dkt#2513, at ¶¶ 15-16.

Exhibit 2 to the Final Fee Application,[27] approximately 91% of all BNEC's assets consisted of equity investments in subsidiaries and intercompany loans to subsidiaries, the majority of which were seized by the FDIC. However, an ever greater concern was (and remained until all issues with the IRS were resolved) that AK and the Chapter 7 Trustee were essentially working for the IRS, which under the priority scheme of the Bankruptcy Code could, if the IRS prevailed, force disgorgement of fees for their ratable share of Estate cash.[28]

32. The Junior Indenture Trustees further allege that Andrews Kurth is speculating as to the magnitude of the estate's "post-petition tax exposure," and suggest AK "likely overstates the actual risk of administrative insolvency."[29] Attached hereto as Exhibit 5 is the affidavit of AK tax partner, Tom Ford, and AK directs the Court to the explanation of the potentially devastating effect of Federal Financial Assistance ("FFA") given by the FDIC to BNEC's subsidiary banks which were part of the BNEC consolidated group. This appears at pages 149-155 of Exhibit 2 to the AK Application.[30] As explained in detail therein, following the financial institution failures in the south in the 1980s the federal government, at the insistence of the regulators of financial institutions, put into effect wide-sweeping legislative changes as reflected in the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"). FIRREA was effective for any FFA received or accrued by a failed bank on or after May 10, 1989. It was not

---

27 *See* Ex. 9-B.

28 *See generally* Ray Aff., Ex. 13. As Mr. Ray explains in his affidavit, on March 28, 1991, he appeared before the Honorable Judge Carol Kenner, the judge who initially presided over the BNEC case in connection with the Trustee's application to employ AK. *Id.* at ¶ 6. In connection with approving the retention of AK, she advised Dr. Branch and Mr. Ray "that we should consider ourselves 'volunteers' in this case because she had substantial doubt that there would be money to pay professionals in this case." *Id.*

29 Omnibus Objection, Dkt#2513, at ¶ 16 n.10.

30 Exhibit 2 to the Final Application is attached as Exhibit 9-B to this Response.

until new Treasury Regulation 597 was issued on December 20, 1995 (almost five years after this case began) that the IRS allowed a bank holding company to disaffiliate from its seized subsidiary banks and thereby avoid paying tax on the FFA provided to such banks.

33. There is no speculation or overstatement involved. The timing of the effective date of FIRREA and the issuance of Treasury Regulation 597 are a matter of public records, as is the March 12, 1996 report from the FDIC Division of Finance as to their Total Resolution Cost for the BNEC subsidiary banks. One need simply do the math to see that had BNEC been liable as a member of a consolidated group for tax on $889,379,000.00 in FFA, general unsecured creditors would have had ***no*** recovery in this case. Furthermore, had the net operating losses of the BNEC consolidated group not been used to their optimum advantage, and AK's multi-year negotiation with the IRS not been successful, the IRS's claim in the estate with respect to the 1989 Quickie Tax Refund would have been equally devastating. AK notes that the IRS settlement was of such import that it had to be approved by the Joint Committee on Taxation.

**(c) Contrary to the Junior Indenture Trustees' claim, 100% payment to creditors is not required for enhancement**

34. As to the Junior Indenture Trustees' third argument, nothing in the case law says enhancement is reserved for only those cases where creditors received 100% payment. That such enhancements are typically paid in 100% cases has not precluded courts from exercising their discretion to award enhancement when not all creditors have received 100% but circumstances warrant, as here. *See In re Chary*, 201 B.R. 783, 788 (Bankr. W.D. Tenn. 1996) (counsel for the chapter 7 trustee was entitled to a fee enhancement where its remarkable efforts resulted in a 40% recovery to creditors in an estate once thought to be administratively insolvent); *In re Baldwin-United Corp.*, 79 B.R. 321, 347 (Bankr. S.D. Ohio 1987) (holding that counsel who

were in large measure "responsible for creditors recovering what will approach 60 cents on the dollar" were entitled to enhancement of more than 11%).

35. Lastly, the Junior Indenture Trustees' assertion that the "requested $2 million enhancement constitutes a large proportion—approximately 10%—of the total distributable cash that remains in the estate" ignores the fact that the amounts remaining in the Estate were a reserve established for the purpose of closing the Estate.[31] It also ignores that the Junior Indenture Trustees received over 97% of a $75 million fourth interim distribution. The Trustee has made four interim distributions to creditors totaling over $275 million.[32] The Chapter 7 Trustee moved to make a substantial distribution of $135 million shortly after settlement of the FDIC Litigation. Andrews Kurth did ***not*** seek an enhancement, nor did it seek an award of the FDIC Litigation interim reductions or E&Y Litigation interim deferrals on the heels of these significant related recoveries. Rather, the Trustee moved to distribute funds to creditors as quickly as possible. A reserve was established at the time of the $75 million fourth distribution for the specific purpose of paying the Senior Indenture Trustee legal fees and the final awards to the Chapter 7 Trustee, AK and BDO Seidman. The reserve is sufficient to pay all fees and expenses requested and make an additional $10 million distribution to creditors even if the requested enhancements are awarded.

---

31 Omnibus Objection, Dkt#2513, at ¶ 19.

32 The motion to make the fourth distribution was filed on August 30, 2011, less than 40 days of the issuance of the First Circuit's mandate in the Postpetition Interest Dispute on July 22, 2011. The only reason it took that long was because the Trustee had to satisfy the Senior Indenture Trustee that sufficient funds were being reserved to pay its legal expense claim, if ultimately allowed. In fact, the Junior Indenture Trustees pushed the Chapter 7 Trustee to make the fourth distribution immediately following the issuance of this Court's ruling in their favor on April 10, 2009, in order to "moot" the appeal the Junior bondholders anticipated the Senior bondholders would file. This precipitated the Senior Indenture Trustees' Emergency Motion for a Stay Pending Appeal, which they filed in this Court on April 14, 2009. The Chapter 7 Trustee declined to make such distribution in the face of threats from the Senior Indenture Trustee. Ultimately, the Junior Indenture Trustees consented to the stay.

### *3. Conclusion: AK has established that equity calls for enhancement*

36. It is easy (and flattering to AK) for the U.S. Trustee and the Junior Indenture Trustees to claim in retrospect that successes which would be exceptional for any other law firm are ordinary for Andrews Kurth. But there must be a continuum of success for any law firm, from ordinary successes for that firm to truly exceptional ones. "[M]any courts have postulated that good results and legal skills are part and parcel of a lodestar calculation, but these courts also (whether they grant or refuse a fee enhancement) without fail repeat the proposition that an enhancement is still available in rare and extraordinary circumstances." *ASARCO LLC v. Baker Botts, L.L.P. (In re ASARCO LLC)*, 477 B.R. 661, 674–75 (S.D. Tex. 2012) (holding that bankruptcy court did not abuse discretion in awarding 20% enhancement on all fees). No one anticipated that any—let alone ***all***—of the three projects for which Andrews Kurth seeks a 10% enhancement would be as complete a success as they each turned out to be. Andrews Kurth's requested $2,488,200.79 lodestar enhancement is appropriate and should be awarded.

## C. The Trustee should also be awarded an enhancement for his truly remarkable job

37. The Chapter 7 Trustee, Dr. Branch, should also be awarded an enhancement[33] for what, in the District Court's words, has been "a truly remarkable job of marshaling BNEC's assets." *In re Bank of New England Corp.*, 295 B.R. at 421.[34]

---

[33] The Junior Indenture Trustees focus on a sentence in the Final Fee Application to suggest that the Trustee erroneously views an award of 3% of the Estate's disbursements as "an entitlement." Omnibus Objection, Dkt#2513, at ¶ 35. While the sentence could perhaps be better worded, the rest of the Application makes clear that the Trustee is not arguing that an award is mandatory; rather, he is requesting an enhancement because he did an exceptional job. That is, the Trustee is entitled to the 3% requested as an adjustment under the lodestar method to his hourly rate because of his exceptional performance and results achieved.

[34] Exhibit 2 to the Final Fee Application, which is a true and accurate reflection of the work performed and the results achieved for the BNEC estate is attached as Exhibit 9-B.

38. Attached as Exhibit 9-A is Dr. Branch's curriculum vitae. Dr. Branch was a tenured faculty member in the school of business at the University of Massachusetts at Amherst when he was elected as the Chapter 7 Trustee, and he remains in that position today. Dr. Branch took the 1991-1992 year off without pay from his position at UMass to work full time as the Chapter 7 Trustee. During this time the liquidation of BNEC's undisputed assets was substantially completed. Thereafter, Dr. Branch managed the accumulated cash to allow for the resolution of BNEC's tax issues and the prosecution of, among other litigation, the Pension Surplus Litigation, the FDIC Litigation, the E&Y Litigation, and the D&O Litigation.

39. The Junior Indenture Trustees argue that Dr. Branch should be awarded only his lodestar amount because it already takes into account the "exceptional services and results obtained."[35] Again, however, "the process of bankruptcy is such that the real value of services will often not be realized until the conclusion of the case." *In re El Paso Refinery, L.P.*, 257 B.R. at 837 n.54.

40. For example, one of the various enhancement criteria is the delay in receiving fees from the time the services were performed. *In re Blue Coal Corp.*, 206 B.R. 721, 723-24 (Bankr. M.D. Pa. 1997). Attached as Exhibit 9-C is a spreadsheet reflecting the hours worked each year by the Trustee over the life of this case, together with the value of Dr. Branch's work based on 1.5% of the amounts available for distribution. The data clearly shows that although the award made by this Court in respect of the Trustee's First Fee Application happened "to be very close to the trustee's proposed hourly earnings," numerous years followed in which this was not the case. *In re Bank of New England Corp.*, 134 B.R. at 466.

---

[35] Omnibus Objection, Dkt#2513, at ¶ 29.

41. It was not until the FDIC Litigation settled in 1998 and the E&Y Litigation settled in 2005 that Dr. Branch was able to "catch up" to some extent, but not completely. The almost seven year delay in closing the BNEC Estate caused by the Postpetition Interest Dispute has meant that Dr. Branch has continued to manage significant amounts of cash for the Estate and comply with all IRS and U.S. Trustee reporting obligations while waiting for payments to which we would have been entitled based on his hourly rates.

42. Furthermore, Dr. Branch has used his expertise in finance to manage the Estate's cash so as to earn $33,104,753.42 in interest on the various sums brought into the case over the course of its administration.[36] This has deferred the costs of the Estate's administration, thereby maximizing creditor recoveries as Dr. Branch waited for the lengthy negotiation with the IRS to be concluded and resolution of the FDIC Litigation, the E&Y Litigation, and the Postpetition Interest Dispute.

43. Dr. Branch's requested $1,272,561.69 enhancement is appropriate and should be awarded.

## **Conclusion**

WHEREFORE, Andrews Kurth respectfully requests that this Court enter an order denying the U.S. Trustee's Limited Objection and the Junior Indenture Trustees' Omnibus Objection, and awarding all amounts requested in AK's and Trustee's Final Fee Applications.

---

[36] *See* Branch Aff., Ex. 9.

Respectfully submitted this 10th day of December, 2012.

**ANDREWS KURTH LLP**

By:/s/ Robin Russell

Robin Russell (BBO #560828)
600 Travis, Suite 4200
Houston, Texas 77002
Office: (713) 220-4200
Telecopy: (713) 220-4285

Paul N. Silverstein
450 Lexington Avenue, 15th Floor
New York, New York 10017
Office: (212) 850-2800
Telecopy: (212) 850-2929

Attorneys for Dr. Ben S. Branch, Chapter 7 Trustee
of Bank of New England Corporation
One State Street, Suite 550
Boston, Massachusetts 02109
Office: (617) 367-2300
Telecopy: (617) 367-8883

**Exhibits to Response**

| | |
|---|---|
| Exhibit 1 | First Monthly Statement of Sullivan & Cromwell LLP, as Counsel to the Debtors and Debtors in Possession, for Compensation for Professional Services rendered and Reimbursement of Expenses Incurred for the Period from January 19, 2012 through February 29, 2012, in *In re Eastman Kodak Co.*, Case No. 12-10202 (ALG), United States Bankruptcy Court, Southern District of New York |
| Exhibit 2 | Summary Sheet for First Interim Application of Covington & Burling LLP, Special Insurance Counsel to the Chapter 11 Trustee, for Allowance of Compensation for Services Rendered and Reimbursement of Expenses Incurred for the Period from November 28, 2011, through May 31, 2012, in *In re MF Global Holdings Ltd.*, Case No. 11-15059 (MG), United States Bankruptcy Court, Southern District of New York |
| Exhibit 3 | Summary Sheet pursuant to United States Trustee Guidelines for Reviewing Applications for Compensation and Reimbursement of Expenses filed under 11 U.S.C. §§ 330 and 331, Davis Polk & Wardwell, in *In re Delta Air Lines, Inc.*, No. 05-17923 (ASH), United States Bankruptcy Court, Southern District of New York |
| Exhibit 4 | Summary of First and Final Application of Kasowitz, Benson, Torres & Friedman LLP as Conflict Counsel and Special Investigative Counsel to the Debtors and Chapter 11 Trustee for Allowance of Compensation for Professional Services Rendered and for Reimbursement of Actual and Necessary Expenses Incurred from November 3, 2011 through March 31, 2012 |
| Exhibit 5 | Affidavit of Thomas W. Ford, Jr. |
| Exhibit 6 | Affidavit of Robin Russell (filed under seal) |
| Exhibit 7 | Docket Sheet, *Branch v. Ernst & Young*, Case No. 1:93-cv-10024-RGS, United States District Court, District of Massachusetts |
| Exhibit 8 | Docket Sheet, *Branch v. New Bank of New England*, Case No. 1:91-cv-10976-RGS, United States District Court, District of Massachusetts |
| Exhibit 9 | Affidavit of Dr. Ben S. Branch, Trustee |
| Exhibit 9-A | Curriculum vitae |

| | |
|---|---|
| Exhibit 9-B | Exhibit 2 to Fifty-Third and Final Fee Application, "Detail of Work Performed and Results Achieved for BNEC Estate" |
| Exhibit 9-C | Spreadsheet of hours worked, expenses, and fees |
| Exhibit 10-1 | Notice of Distribution to Holders of Bank of New England Corporation 9⅞% Subordinated Notes Due 1999 |
| Exhibit 10-2 | Notice of distribution to Holders of Bank of New England Corporation 8¾% Subordinated Capital Notes Due 1999 |
| Exhibit 10-3 | Notice of distribution to Holders of Bank of New England Corporation Floating Rates Subordinated Notes Due 1999 |
| Exhibit 11 | Affidavit of Nancy Palazzolo |
| Exhibit 12 | Affidavit of Robin Russell |
| Exhibit 13 | Affidavit of Hugh M. Ray |

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was served on the United States Trustee, 5 Post Office Square, Suite 1000, Boston MA 02109-3934, by email to John.P.Fitzgerald@usdoj.gov and Jennifer.L.Hertz@usdoj.gov delivery on the 10th day of December, 2012.

/s/ Robin Russell
Robin Russell