UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
EASTERN DIVISION

_____

IN RE:
BANK OF NEW ENGLAND
CORPORATION,                                          Chapter 7
            DEBTOR.                          Case No. 91-10126-WCH

_____


**MEMORANDUM OF DECISION**

I. <u>INTRODUCTION</u>

        The matters before the Court are the "Fifty-Third and Final Application for Allowance of

Attorneys' Fees and Reimbursement of Expenses by Andrews Kurth LLP Attorneys for the

Chapter 7 Trustee"[1] (the "AK Application") filed by Andrews Kurth LLP ("Andrews Kurth"),

counsel to Dr. Ben S. Branch ("Dr. Branch"), the Chapter 7 trustee,[2] the "Chapter 7 Trustee's

Final Application for Allowance of Compensation"[3] (the "Branch Application") filed by the Dr.

Branch, the "United States Trustee's Limited Objection to Fifty-Third and Final Application for

Allowance of Attorneys' Fees and Reimbursement of Expenses by Andrews Kurth LLP

Attorneys for the Chapter 7 Trustee"[4] (the "UST Objection") filed by the United States Trustee,

and the "Omnibus Objection of Junior Indenture Trustees to Final Fee Applications of Chapter 7

Trustee and Andrews Kurth LLP"[5] (the "Omnibus Objection") filed jointly by Bank of New

_____

[1] Docket No. 2478; *see also* "Supplement to Final Fee Application of Andrews Kurth LLP," Docket No. 2504.

[2] For the sake of ease and clarity, I will refer to Dr. Branch by name, rather than title, in light of the number of
parties in this case who refer to themselves as "trustees."  No disrespect is intended.

[3] Docket No. 2477.

[4] Docket No. 2506.

[5] Docket No. 2513.

York Mellon Trust Company, N.A., and U.S National Bank National Association, as indenture

trustees (collectively, the "Junior Indenture Trustees").   Several creditors also filed letters

objecting to one or both of the applications, which I will refer to collectively as the "Pro Se

Objections."[6]  Andrews Kurth filed a series of responses to the various objections.[7]  Lastly, I

have also taken the "Amended Trustee's Final Report"[8] under advisement, as the resolution of

the applications will impact the proposed distributions.[9]

These matters came before me after a non-evidentiary hearing held on December 11,

2012.[10]  Generally speaking, the various objections are directed at Andrews Kurth's request for

certain fees and expenses in the amount of $1,738,959.18 (the "Deferred Requests") that were

previously deferred or disallowed in my Memorandum of Decision[11] regarding the first interim

fee applications (the "Fee Decision") and its request for a fee enhancement in the amount of

---

[6] Specifically, these objections are: the "Objection to Fifth [sic] Third and Final Fee Application of Andrews & Kurth" filed by William L. Eddlemen, Jr., Docket No. 2500; the letter objection filed by Dane Fulmer, Docket No. 2505; the "Objection to the Distribution of the Trustee's Final Report" filed by Gail M. Rabitor, Docket No. 2507; the letter objection filed by J. Eric Wagoner, Docket No. 2508; the letter objection filed by John V. Koerber, Docket No. 2523; and the letter objection filed by Pearl Elias, Docket No. 2524.

[7] *See* "Andrews Kurth LLP's Response to the United States Trustee's Objection to Andrews Kurth LLP's Fifty-Third and Final Fee Application for Allowance of Attorneys' Fees and Expenses (On Non-Enhancement Issues)," Docket No. 2521; "Andrews Kurth LLP's Response to the Omnibus Objection of Junior Indenture Trustees to Final Fee Applications of Chapter 7 Trustee and Andrews Kurth LLP (Non-Enhancement Issues)," Docket No. 2525; "Response to the United States Trustee's Limited Objection to Fifty-Third and Final Application for Allowance of Attorneys' Fees and Reimbursement of Expenses by Andrews Kurth LLP Attorneys for the Chapter 7 Trustee (Enhancement)," Docket No. 2526.

[8] Docket No. 2514.

[9] The parties have informed me that there is a discrepancy with respect to the amount paid to U.S. Bank National Association and that the parties will resolve it soon.  Trans. Dec. 11, 2012 at 14:1-25.

[10] Prior to start of her remarks with respect to the AK Application, Attorney Robin Russell of Andrews Kurth ("Attorney Russell") asked that she be sworn in so that she could provide testimony regarding Andrews Kurth's services over the course of this case.  Counsel to the Junior Indenture Trustees objected, noting that the hearing had been noticed as non-evidentiary and asserting that additional evidence was inappropriate at this stage.  I sustained the objection, but indicated that because I would be taking the AK Application under advisement, additional proceedings were possible if any party deemed it necessary.  Trans. Dec. 11, 2012 at 16:11-25, 17, 18:1-15. Thereafter, no party requested a further evidentiary hearing.

[11] *In re Bank of New England Corp.*, 134 B.R. 450 (Bankr. D. Mass. 1991), *aff'd*, 142 B.R. 584 (D. Mass. 1992).

$2,488,130.07.[12]   The Junior Indenture Trustees also object to Dr. Branch's request for a fee enhancement in the amount of $1,272,561.69.[13]   After several hours of extensive oral argument from Andrews Kurth, the United States Trustee, and the Junior Indenture Trustees, I took the matters under advisement.   At my direction, the parties subsequently filed a "Joint Report of Remaining Objections of United States Trustee and Junior Indenture Trustees to Andrews Kurth LLP's Fifty-Third and Final Fee Application for Allowance of Attorneys' Fees and Expenses," indicating that some of the objection to the Deferred Requests had been withdrawn.[14]   Andrews Kurth also filed a "Post-Hearing Submission Relating to FDIC Interim Reductions" in support of their contention that certain Deferred Requests relating to litigation with the FDIC were not previously waived.[15]

In order to accommodate the parties' desire to disburse all estate funds by the end of the year, I have expedited my consideration of the applications and objections thereto.   From the outset, I note that neither application is a paragon of clarity, with each containing numerical errors, inconsistent statements, and extraneous information.   This, coupled with the plethora of responses, thousands of pages of exhibits, and references to non-digitized records, has required me to prioritize speed over detail.   Nevertheless, all arguments and exhibits, whether or not expressly mentioned, have been fully considered.   For the reasons set forth below, I will approve the AK Application in part subject to several reductions, and approve the Branch Application.

---

[12] The Junior Indenture Trustees also objected to any fees incurred for activities related to Andrews Kurth's request for enhancement.

[13] As will be discussed more fully below, there is a question as to whether or not this amount truly constitutes an enhancement.

[14] Docket No. 2544.

[15] Docket No. 2547.

## II. BACKGROUND

At the time its petition was filed, Bank of New England Corporation ("BNEC") was the third largest bankruptcy in United States history.  In the two decades that it has remained pending, it has only been surpassed by a dozen or so larger cases.  Nevertheless, it remains unique in this district for both its size and complexity.

While some context is required, particularly with respect to the requests for enhancement, I will forgo an exhaustive recitation of the history of this case and its related proceedings. Instead, I will focus solely on those parts necessary to frame the issues now before me.  Notably, the facts themselves are not in dispute, only the qualitative conclusions that may be drawn therefrom.  Accordingly, the facts as stated below are taken in large part from Exhibit 2 to the AK Application and Attorney Russell's presentation at the December 11, 2012 hearing.[16]

### A.  Factual and Procedural History

BNEC was a holding company for a variety of bank and non-bank subsidiaries headquartered in Boston.[17]  Ultimately, what Dr. Branch characterized as "an overly aggressive and careless lending program" led to its downfall.[18]  Regulators seized the bank subsidiaries— Bank of New England, N.A., Connecticut Bank & Trust Company, N.A., and Maine National Bank—on January 6, 1991.[19]  After taking over as receiver for these bank subsidiaries, the Federal Deposit Insurance Corporation (the "FDIC") established three new banks (the "Bridge Banks") that would assume certain of the assets and liabilities of the prior institutions and

---

[16] *See* Docket No. 2478, Ex. 2; Trans. Dec. 11, 2012 at 18-53.

[17] *In re Bank of New England Corp.*, 134 B.R. at 453.

[18] Trans. Dec. 11, 2012 at 19:5-11.

[19] *In re Bank of New England Corp.*, 134 B.R. at 453.

continue to provide banking services while the FDIC sought a purchaser for the Bridge Banks.[20]

Ultimately, Fleet/Norstar Financial Group ("Fleet") was the successful bidder of certain of the

Bridge Bank assets, while the rest remained in an FDIC receivership.[21]

On January 7, 1991, BNEC filed a voluntary Chapter 7 petition.[22]  On the petition date,

BNEC listed assets of $941,487,058.59.[23]  Approximately 91% of that figure represented equity

investments in subsidiaries and intercompany loans to subsidiaries, the majority of which had

been seized by the FDIC.[24]    BNEC's investment portfolio, which accounted for approximately

.5% of the estate's assets, was illiquid.[25]

An interim Chapter 7 trustee was appointed, but at the March 21, 1991 meeting of

creditors held pursuant to 11 U.S.C. § 341, Dr. Branch was elected Chapter 7 trustee for

BNEC.[26] Dr. Branch is a tenured professor at the University of Massachusetts Amherst.  He had

previously been elected chairman of the unsecured creditors' committee in the First

RepublicBank Corporation Chapter 11 case while on sabbatical and working as a scholar in

residence for Monarch Capital.[27]    Andrews Kurth served as counsel to the committee in that

case.[28]  Upon his election, Dr, Branch sought and obtained authorization from Judge Carol

---

[20] Docket No. 2478, Ex. 2 at ¶ 3.

[21] *Id.* at ¶ 4.

[22] *Id.*

[23] *Id.* at ¶ 5.

[24] *Id.* at ¶ 6.

[25] *Id.*

[26] *Id.* at ¶ 2.

[27] Trans. Dec. 11, 2012 at 22:13-23.

[28] *Id.* at 22:22-23.

Kenner (ret.), who presided over this case before my appointment to the bench, to retain

Andrews Kurth as his counsel.[29]  Judge Kenner declined to establish any interim compensation

procedures.[30]   As such, Andrews Kurth received no compensation for their work in this case

from March 23, 1991, until December 9, 1991, when I approved the first interim applications in

this case.[31]   As a result, Attorney Russell represents that her former partner twice had to obtain

waivers from the firm's managing partner to continue to its representation of Dr. Branch in

BNEC.[32]

Attorney Russell explained some of the difficulties faced by Andrews Kurth and Dr.

Branch in this case.   Due to BNEC's systematic down-streaming of assets, internal

documentation was often incomplete, leading to litigation.[33]   Additionally, Dr. Branch and his

professionals faced hostility from BNEC employees which made it difficult to investigate the

portfolios of assets and pursue claims.  According to the Affidavit of Nancy Palazzolo, a former

payroll tax manager in the BNEC accounting department, she was instructed by her superiors not

to assist or cooperate with Dr. Branch or his representatives.[34]   As a result, Andrews Kurth

adopted a strategy whereby they would seek out the assistance of former employees, and later,

former regulators.[35]

---

[29] Docket No. 2478, Ex. 1.

[30] Trans. Dec. 11, 2012 at 24:3-8.

[31] *Id.* at 24:9-11.

[32] *Id.* at 24:13-14.

[33] *Id.* at 28:22-25; 29:1-4.

[34] Docket No. 2526, Ex. 11; Trans. Dec. 11, 2012 at 29:23-25; 30:1-9.

[35] Trans. Dec. 11, 2012 at 30:10-24.

The following table summarizing the work performed by Dr. Branch and his professionals and the results achieved was included in both the AK Application and the Branch Application.[36]  Though long, it provides a brief overview of this bankruptcy and helps illustrate why this case has been open for over two decades.

| Project | Major Tasks/Result | Value to the Estate |
|---|---|---|
| Tax Analysis & Planning | Avoided administrative insolvency as a result of Federal Financial Assistance<br><br>Assured Distribution for Unsecured Creditors through favorable settlement of IRS priority claim | Negotiated settlement of $7,200,000 to resolve IRS priority claim including claim for prepetition "Quickie Refund" of 89 million |
| | | Disaffiliated BNEC from Subsidiary Banks to avoid administrative insolvency from income tax liability for Federal Financial Assistance of $800 million |
| | | Negotiated § 338(b)(10) election with Fleet resulting in payment to the estate of $1,504,097 |
| | | Pursued and recovered $1,222,691.74 in tax refunds |
| BNE Trust Company, N.A. | Negotiated Sale of Company<br><br>Recovered on Loan to President by settlement | $4,347,057.13 in cash proceeds<br><br>$4,556.50 cash proceeds |
| BNE Capital Markets, Inc. | Negotiated Sale of Company | $6,159,766 in cash proceeds |
| Constitution Capital Management Company | Negotiated Sale of Company | $6,929,515.03 in cash proceeds |
| Pertinax Properties | Negotiated Sale of Company | $268,983.66 in cash proceeds |
| BNE Clearing Corporation | Negotiated Sale of Company | $362,356.00 in cash proceeds |
| New England Banker, Inc. | Negotiated Sale of Company | $1,439,145 in cash proceeds |
| BNE Capital Corporation | Long term service contract with Bank of Tokyo which encumbered leases terminated through negotiated settlement<br><br>Marketed and sold leverage portfolio | $13,293,279.82 in cash proceeds to the estate |

---

[36] Branch Application, Docket No. 2477 at 6-12; AK Application, Docket No. 2478 at 11-17.

7

| | | |
|---|---|---|
| BNE Airfinance | Ownership Dispute with FDIC Settled<br><br>Sale Completed | $8,804,557.99 in cash proceeds to the estate |
| BNE International Leasing Corporation | Negotiated Sale | $75,000 in cash proceeds |
| CBT Acceptance Corporation | Recovery/collection of residual payments | $1,757,079.92 in cash proceeds |
| General Discount Corporation | Recovery/collection of residual payments | $1,133,629.21 in cash proceeds<br><br>$602,499.47[37] |
| | Resolved Penrick Drilling Company vs. General Discount Corporation | $70,638.47 in cash settlement proceeds |
| | Resolved Cooper v. General Discount Corporation | $111,361.05 in cash settlement proceeds |
| | Investigation, analysis and settlement of Pena Bankruptcy Estate | $86,515.81 in cash settlement proceeds |
| | Resolved North American Corporation ("NACO") v. General Discount Corporation | $10,000 in cash settlement proceeds |
| | Investigation of $34,000 claim against Pronto Stamping | No recovery |
| | Investigation of $6,860 claim against B&F Leasing Company | No recovery |
| | Resolved Arrowhead Drilling Corporation | $51,911.05 in cash settlement proceeds |
| | Investigation of GDC's third lien in *Ben Franklin Federal Savings v. Kerrigan, General Discount, et al* | No recovery |
| | Resolved General Discount Corporation vs. Photomagic International, Inc., et al. | $68,498.02 in cash settlement proceeds |
| | Resolved General Discount Corporation v. Jerry Stripling | $7,000 in cash settlement proceeds |
| Lazere Financial Corporation | Investigation of Assets | $21,025.19 in cash settlement proceeds |
| | Theetge Settlement | $37,000 in cash settlement proceeds |

---

[37] The significance of this value is unclear.

|  | Security Pacific Settlement | $11,479.85 in cash settlement proceeds |
|---|---|---|
|  | Residual Payments | $15,286.05 |
| New England Discount Brokerage, Inc. | Investigation of wholly-owned subsidiary | No assets/no recovery |
| BNE Asset Sales, Inc. | Investigation of wholly-owned subsidiary | No assets/no recovery |
| BNE Corporate, Inc. | Investigation of wholly-owned subsidiary | No assets/no recovery |
| BNE General Services Corp. | Investigation of wholly-owned subsidiary | No assets/no recovery |
| BNE Life Insurance Company | Investigation of wholly-owned subsidiary | $115,205.03 in cash recovered from Arizona bank account |
|  |  | $99,992.00 in cash recovered from bond posted to Arizona Insurance Board |
| BNE Massachusetts Corp. | Investigation of wholly-owned subsidiary | $14,730.31 in cash settlement proceeds |
|  | Settlement with major creditor | Withdrawal of $9,477,019.74 claim asserted by Penn Mutual against BNEC alleging successor liability |
| BNE Mortgage Corporation | Investigation of $1,500,000 owed to BNEC | No assets/no recovery |
| BNE Mortgage Services Corporation | Investigation of $155,000 owed to BNEC | No assets/no recovery |
| BNE Old Colony Co. | Investigation of wholly-owned subsidiary | No assets/no recovery |
| BNE Realty Credit Corporation | Settlement with FDIC over loan origination fee | $50,000 in cash settlement proceeds |
| BNE Realty Leasing | Recovered dormant funds | $3,338.12 in cash settlement proceeds |
| CBT Capital Corporation | Intermediate Holding Company for Concap, BNE Trust and BNE Clearing | Value reported individual for those subsidiaries |
| CBT Corporation | Intermediate Holding Company for Concap, BNE Trust and BNE Clearing | Value reported individual for those subsidiaries |
| CBT Financial Corporation | Intermediate holding company for GDC, Lazere and CBT Acceptances | Value reported individual for those subsidiaries |
| CBT Realty Corporation | Sold to FDIC 12/21/94 | $30,000.00 in cash settlement proceeds |
| Citation II Corporation | Investigation of $10,000 intercompany | No assets/no recovery |

9

| | | |
|---|---|---|
| Maine National Corporation | Investigation of wholly-owned subsidiary | No assets/no recovery |
| New England Capital (Canada) Ltd. | Settlement of Dellece litigation | $115,016.51 in cash settlement proceeds |
| New England Commercial Finance Corporation | Investigation | No assets/no recovery |
| Transitions Two, Limited Partnership | Investigation, analysis & sale | $687,513.18 in cash settlement proceeds |
| Sale of ViewLogic Stock | Investigation, analysis & sale | $2,162,193.98 in cash settlement proceeds |
| Landmark Partners | Investigation, analysis & sale | $4,929.58 in cash settlement proceeds |
| Connecticut Seed Ventures | Investigation, analysis & sale | $450,000.00 in cash settlement proceeds |
| Douglas Communication, L.P. | Investigation, analysis & sale | $329,009.98 in cash settlement proceeds |
| POA Acquisition Corporation | Investigation, analysis & sale | $4,524,601.17 in cash settlement proceeds |
| Executive Re, Inc. | Investigation, analysis & sale | $1,187,192.18 in cash settlement proceeds |
| Workgroup Solutions, Inc. | Investigation, analysis & sale | $6,603,851.65 in cash settlement proceeds |
| BankEast | Pursued Claim in Class Action Settlement | $82,785.50 in cash settlement proceeds |
| Hartford Whalers Hockey Club (a Limited Partnership) | Investigation, analysis & sale | $200,000 in cash settlement proceeds |
| Sale of Emengent Stock | Investigation, analysis & sale | $115,321.21 in cash settlement proceeds |
| Bank Boston of Commerce | Investigation, analysis & sale | $14,841.88 in cash settlement proceeds |
| Kathadin Securities of Maine, L.P. | Investigation, analysis & sale | $50,147.98 in cash settlement proceeds |
| The Compad, L.P. | Investigation, analysis & sale | $244,254.75 in cash settlement proceeds |
| Tritek Southern Communications, Ltd. | Investigated $492,320 subordinated loan settled in bankruptcy of Tritek | $32,824.40 in cash settlement proceeds |
| THL Holdings, Inc. | Investigation, analysis & sale | $27,481.54 in cash settlement proceeds |
| Sale of Niagara Mohawk Preferred Stock | Investigation, analysis & sale | $2,270,738.88 in cash settlement proceeds |
| Sale of Intelligent Stocks | Investigation, analysis & sale | $4,605.70 in cash settlement proceeds |
| NASDAQ Antitrust Litigation Settlement | Investigation, analysis & settlement | $1,389.45 in cash settlement proceeds |
| Loan to former employee | Investigation, analysis & | $46,000.00 in cash settlement |

| Daniel Aquilino | settlement | proceeds |
|---|---|---|
| Variety Tours | Recover & collection of unclaimed fund | $8,543.90 in cash proceeds |
| Art | Successfully asserted ownership of art against FDIC<br><br>Identified art broker & sold art | $71,580.53 in cash settlement proceeds |
| Software | Negotiated Sale to Fleet | $602,460.82 in cash settlement proceeds |
| Hardware | Negotiated Sale | $1,500.00 in cash settlement proceeds |
| Trademarks | Recovered value for use of trademarks by Bridge Banks in FDIC settlement | |
| | Negotiated sale of Bank of New England trademark | $50,000.00 in cash settlement proceeds |
| BNE Premiums | Conducted sales | $32,336.93 in cash settlement proceeds |
| Transfer Agent Balance | Negotiated settlement with Mellon | $640,456.52 in cash settlement proceeds |
| UNUM Stock | Ownership dispute with FDIC settled<br><br>Sale completed | $596,573.96 in cash settlement proceeds |
| Travelers Insurance Premium Refund | Settled | $2,011,709.87 in cash settlement proceeds |
| FDIC Accounts Litigation | Filed Complaint Seeking recovery of frozen accounts<br><br>Settled Dispute w/FDIC over seized bank accounts | $12,556,051.38 in unencumbered cash settlement proceeds recovered for estate<br><br>$10,782,649.50 in additional cash recovered and earmarked for settlement of IRS priority claims |
| Maine Taking Case | U.S. Government sued under "Takings Clause" for value of Maine National Bank | None/overturned on appeal |
| FDIC Furniture, Fixtures and Equipment Litigation | Investigation<br><br>Litigation commenced against FDIC<br><br>Settled with FDIC by sale of FF&E to FDIC/Fleet | $902,860.17 in cash settlement proceeds |
| Fraudulent Conveyance Litigation & Catch-All | Motion to Dismiss defeated | $140,000,000.00 in cash settlement proceeds |

| | | |
|---|---|---|
| Litigation | Extensive Discovery<br><br>Defendant's Motion for Summary Judgment defeated<br><br>Settled in multi-day mediation | $54,050,685.22 in Bridge Bank claims against estate withdrawn |
| Pension Plan Surplus Litigation | Trustee filed Declaratory Judgment action to establish ownership of surplus and authority to terminate<br><br>Settlement w/FDIC and certified class of Former Retirees Reached<br><br>Successful Audit by IRS & PBGC<br><br>Annuitization of Participants and Plan Termination | $12,740.633.85 in cash settlement proceeds |
| D&O Litigation | Trustee successfully intervened in prepetition shareholder action<br><br>Settlement Negotiated with Primary Owner<br><br>Settlement Negotiated with excess carrier | $5,202,793.25 cash settlement proceeds from primary carrier |
| Ernst & Young Litigation | Defendants Motion to Dismiss defeated<br><br>Defendants Motion for Summary Judgment defeated<br><br>Extensive discovery and trial preparation<br><br>Settled at end of first week of anticipated 3-week trial | $84,000,000.00 in cash settlement proceeds<br><br>Withdrawal of E&Y proof of claim $36,984.11 |
| Preference Litigation | Investigation, 40+ lawsuits filed, litigation & settlement | $7,000,000.00+ in cash settlement proceeds<br><br>$45,000.00 in unsecured claim against the estate withdrawn |

For purposes of the AK Application, there are three main projects whose asserted "'exceptional' results for the BNEC . . . were the result of the dedication, skill, and creativity of AK attorneys" such that they contend they are entitled to a fee enhancement: (1) the implementation of a tax strategy to avoid administrative insolvency and a large tax claim; (2) the FDIC litigation recoveries; and (3) the Ernst & Young ("E&Y") litigation recoveries.[38]

### 1.   The Tax Strategy

As previously stated, Andrews Kurth contends that among its "exceptional" results in this case is a tax strategy that avoided administrative insolvency and a large tax claim.  As will be explained, this strategy was aimed at both pre- and post-petition tax liabilities that would have dealt a crippling blow to the BNEC estate.

BNEC filed consolidated federal income tax returns for itself, the bank subsidiaries and other subsidiaries prior to the FDIC seizure.[39]  In 1989, BNEC, with its consolidated subsidiaries (the "Consolidated Group"), recognized net operating losses for federal income tax purposes which could be carried back to previous years allowing for a tax refund.[40]  In 1990, BNEC applied for what is colloquially referred to as a "quickie" tax refund which allowed it to receive a tentative refund on an expedited basis.[41]  The local office of the Internal Revenue Service ("IRS") authorized the payment of a tax refund totaling approximating $85,000,000 (the "1989

---

[38] Docket No. 2478 at ¶ 33.

[39] Docket No. 2478, Ex. 2 at ¶ 382.

[40] *Id.* at ¶ 383.

[41] *Id.*

Refund").[42]   This money was immediately down-streamed to create much needed liquidity for the bank subsidiaries.[43]

Although the 1989 Refund was authorized by the local IRS office, it required approval from the Congressional Joint Committee on Taxation because it exceeded $1,000,000.[44] While the IRS advised Dr. Branch that any tax assessment with respect to the 1989 Refund was unlikely, the Joint Committee ultimately disagreed and directed the local office of the IRS to recalculate the appropriate 1989 tax refund based on its review.[45]   The IRS subsequently determined that BNEC had been over-refunded approximately $14,000,000, without interest, from the 1989 Refund.[46]

In June, 1994, representatives of BDO Seidman, the accounting firm retained by Dr. Branch, Andrews Kurth, and the FDIC met with IRS officials to review certain factual discrepancies with respect to the 1989 Refund.[47]   Shortly thereafter, the IRS issued a notice of proposed adjustment reducing the over-refunded amount to approximately $9,200,000.[48]   Still dissatisfied, BNEC filed a written protest of the proposed adjustments on September 28, 1994.[49] Following lengthy negotiations, Dr. Branch and the IRS reached a compromise reducing the

---

[42] *Id.*

[43] *Id.*

[44] *Id.* at ¶ 384.

[45] *Id.* at ¶¶ 388-389.

[46] *Id.* at ¶ 389.

[47] *Id.* at ¶ 393.

[48] *Id.*

[49] *Id.* at ¶ 394.

over-refunded amount to $6,262,252, inclusive of interest.[50]  Dr. Branch moved for approval of the compromise on February 29, 1996, which I granted on April 10, 1996.[51]

On July 17, 1997, the IRS filed an amended unsecured priority claim in the amount of $8,626,747.53 and a general unsecured claim in the amount of $48,265.35.[52]  Dr. Branch and the IRS engaged in settlement discussions from March to December 1998, the result of which was a stipulation reducing the amount of the claim and giving effect to a setoff in the amount of $777,010, rendering the IRS's claim allowed in the amount of $7,200,000.[53]

During the same period in which Dr. Branch and Andrews Kurth were resolving the prepetition tax claim arising from the 1989 Refund, BNEC was also facing the threat of substantial post-petition tax liabilities.  This threat arose from the bank subsidiaries' and the Bridge Banks' receipt of federal financial assistance ("FFA") from the FDIC.[54]  Section 597(a) of the Internal Revenue Code of 1986 (the "I.R.C.") provided that the treatment of any transaction in which FFA is provided with respect to a bank shall be determined under the regulations prescribed by the Secretary of the Treasury.[55]  Generally speaking, under the regulations in effect until 1992, a bridge bank, having received a prior institution's assets and liabilities, was treated as the successor of the prior institution for purposes of membership in a consolidated group.[56]  Moreover, the regulations provided that FFA was included in the taxable

---

[50] *Id.* at ¶ 395.

[51] *Id.*

[52] *Id.* at ¶ 406.

[53] *Id.* at ¶ 408.

[54] *Id.* at ¶ 414.

[55] *Id.* at ¶ 415.

[56] *Id.* at ¶¶ 416-418.

income of the bridge bank, and therefore, the consolidated group.[57]  According to the Affidavit of Thomas W. Ford, Jr. ("Attorney Ford"), a partner at Andrews Kurth specializing in tax, this means that BNEC potentially faced imputed income in the amount of $889,000,000 on account of FFA supplied to the Bridge Banks as members of its Consolidated Group.[58]

On December  20, 1995, however, the IRS issued final regulations under I.R.C. § 597 that generally retained the same rules regarding Bridge Banks succeeding to the transferor bank's status as a member of a consolidated group, but allowed for an irrevocable election to disaffiliate the recipient of FFA to be made by the consolidated group.[59]  As a consequence of disaffiliation, a "toll charge" is added to the institution's income in an amount equal to the institution's liabilities over the adjusted tax bases of its assets immediately before it is placed in receivership.[60]  Additionally, "the alternative minimum tax limitations on the use of alternative minimum tax net operating loss carryforwards are not applicable to the extent that inclusion of the toll charge in income would result in the consolidated group having taxable or alternative minimum taxable income for the taxable year."[61]

After extensive analysis, Attorney Ford and representatives of BDO Seidman concluded that if BNEC were authorized to disaffiliate, Dr. Branch would be required to report on BNEC's amended federal income tax returns for the years following 1990 additional tax liabilities in the approximate amount of $1,000,000.[62]  Moreover, BNEC's amended tax return for 1991 would

---

[57] *Id.*

[58] Docket No. 2526, Ex. 5 at ¶ 20.

[59] Docket No. 2478, Ex. 2 at ¶¶ 419-421.

[60] *Id.* at ¶ 421.

[61] *Id.*

[62] Docket No. 2526, Ex. 5 at ¶ 13.

include a "toll charge" on the income Bank of New England, N.A. in the approximate amount of $227,000,000, which would be offset by net operating loss carryforwards of the Consolidated Group.[63]  They advised Dr. Branch to take this course of action because the ultimate liability that BNEC could have faced would have far exceeded these figures.[64]  Having accepted his professional's advice, Dr. Branch moved for an order authorizing his election to disaffiliate on May 9, 1996.[65]  I granted the motion on May 20, 1996.

In his affidavit, Ford explains that he has been unable to determine the full impact, if any, to BNEC's estate attributable to FFA due to a lack of documentation from the Bridge Banks, which he understands have not operated at a profit and have not filed tax returns.[66]  In sum, he believes that without disaffiliation, the BNEC estate could have been rendered insolvent as a member of the Consolidated Group.[67]

### 2.   The FDIC Litigation

Dr. Branch asserted causes of action against the FDIC, the Bridge Banks, and Fleet referred to as the "Accounts Litigation," (ii) the "Fraudulent Conveyance Litigation," (iii) the "FF&E Litigation," (iv) the "Catch-All" Litigation, and (v) the "Maine Taking Litigation."[68]  Not surprisingly, summarizing these individual actions would be prohibitively lengthy.  Therefore,

---

[63] *Id.*

[64] *Id.*

[65] *Id.* at ¶ 15.

[66] *Id.* at ¶¶ 17-18.

[67] *Id.* at ¶ 21.

[68] Docket No. 2478, Ex. 2 at ¶ 207.

the summary set forth on pages 71 through 109 of Exhibit 2 to the AK Application is hereby incorporated by reference.[69]

At the December 11, 2012 hearing, Attorney Russell discussed some of the extraordinary efforts undertaken by Andrews Kurth to find experts and witnesses needed to evaluate and pursue the FDIC litigation:

> First, and one of the things that was significant, I was living here in Boston and the Boston University School of Law has an LL.M. program in banking and it just so happened that the teacher, the instructor for the problem loan class was a man named Andrew Granger, who was the head of Recoll Management, which was the FDIC's company set up to liquidate the Bank of New England's loan portfolio. I enrolled in that class and I was able to spend a semester listening to him talk about what was going on there and the problems they encountered, and that was one of the bases on which we started the process of figuring out how we were going to value that loan portfolio.
>
> We ultimately were able to get some people who had been at the bank and in one of the affidavits I submitted in support of this I point to a man named Dick Stover. As we -- we concluded that sometimes we found witnesses and made them into experts because there were no experts out there that knew how to do exactly what we needed to be done because this hadn't been done before, but through Putnam Hayes & Bartlett, our consulting firm, working with them we were able to identify people to be our expert witnesses.
>
> Another one that is set forth in our affidavit is a professor named Joseph Sinkey at the University of Georgia in Athens. He is now retired. He was a most interesting individual who had as a professor of banking at the University of Georgia, not knowing that any of the litigation was going on, decided that he was going to write about Bank of New England N.A. and study what had caused its failure. And we came upon him and I traveled to Georgia and spent a week with him, which was very interesting. He was a brilliant man. And ultimately, although he'd never been a expert witness before, we agreed to serve as one of our expert witnesses to testify as to what had caused the failure of BNE, N.A., and the banking system and we had expert report for him.[70]

---

[69] Docket No. 2478, Ex. 2 at 71-109.  *See also Branch v. F.D.I.C.*, 223 B.R. 605 (D. Mass. 1998); *Branch v. F.D.I.C.*, 833 F. Supp. 56 (D. Mass. 1993); *Branch v. F.D.I.C.*, 825 F. Supp. 384 (D. Mass. 1993).

[70] Trans. Dec. 11, 2012 at 37:2-25; 38:1-10.

3.   The E&Y Litigation

On January 6, 1993, Dr. Branch filed an action to enforce BNEC's rights against E&Y. BNEC engaged the accounting firm of E&Y as early as 1982 to provide services including, but not limited to, auditing the financial statements and the consolidated figures of BNEC and of its subsidiaries.[71] Dr. Branch alleged that beginning in 1985, BNEC embarked on a rapid expansion plan that was financed by making risky loans in the New England real estate market, in developing nations, and in leveraged buyouts.[72] It was asserted that from 1985 to 1990, millions of dollars were loaned without adequate safeguards.[73]  Dr. Branch asserted that BNEC relied upon E&Y in pursuing this strategy, and that E&Y's opinions concerning the financial health of BNEC and its subsidiaries validated the continuation of BNEC's high-growth, high-risk strategy through 1988 and well into 1989, causing many more risky loans to be made without adequate safeguards, even though E&Y knew or should have known that BNEC did not have the ability or the policies and procedures in place to manage such growth.[74] He further alleged that E&Y knew that BNEC's financial health was critically dependent upon a rapidly deteriorating real estate market, yet took no steps to identify the undue concentration of loans in real estate or to suggest that underwriting procedures be improved to mitigate, as best as practicable, the detrimental effect of the downturn in the New England real estate market.[75]

---

[71] Docket No. 2478, Ex. 2 at ¶ 338.

[72] *Id.* at ¶¶ 339-340.

[73] *Id.* at ¶ 340.

[74] *Id.* at ¶ 341.

[75] *Id.*

The case, in short, was based on the premise that E&Y's conduct disguised BNEC's numerous problems and validated BNEC's destructive course.[76]  Moreover, because E&Y failed to warn, emphasize the seriousness, and/or otherwise counsel and advise BNEC on the dangers of the unsafe and unsound policies and procedures in use during this period, BNEC assumed that its actions were acceptable.[77]

The District Court dismissed Dr. Branch's complaint on the grounds that he was asserting impermissible derivative claims, but afforded him the opportunity to amend his complaint to the extent that he could identify a damage to BNEC separate and distinct from any damage suffered by the subsidiaries.[78]  His amended complaint alleged that certain transfers of fees to E&Y were avoidable as preferential and fraudulent transfers under the Bankruptcy Code and that BNEC sustained damage as a result of E&Y's failure to properly audit the financial statements of BNEC and its numerous subsidiaries.[79]  E&Y moved to dismiss, but the District Court denied the motion.[80]

It took fourteen years for the E&Y litigation to go to trial.  Attorney Russell explained that part of the reason for delay was that the E&Y litigation was being hard fought and a conscious effort was made to slow the proceeding down so that Andrews Kurth, who was concurrently engaged in litigation with the FDIC, could resolve that matter first.[81]  Despite a

---

[76] *Id.* at ¶ 343.

[77] *Id.*

[78] *Id.* at ¶¶ 344-345.

[79] *Id.* at ¶ 345.

[80] *Id.* at ¶ 346.

[81] Trans. Dec. 11, 2012 at 44-45.

very aggressive defense, the first week of trial went very well for Dr. Branch.[82]  On the third day

of trial, E&Y reinitiated settlement discussions which culminated in a settlement in the amount

of $84,000,000.[83]

Attorney Russell explained that among the extraordinary efforts of Andrews Kurth with

respect to the E&Y litigation was their capacity to find fact witnesses.  For example, one of their

most compelling witnesses was Vivian Cook, who had worked for the Office of the Comptroller

of the Currency and "was on the team that went in to Bank of New England N.A. and figured out

how bad things were."[84]  After she retired and moved to a farm in Pennsylvania, Attorney Jim

Higgason tracked her down, befriended her, and got her to agree to come to Boston to testify.[85]

Attorney Russell further explained the difficulty Andrews Kurth experienced searching

for an accounting malpractice expert.[86]  Because accountants at the "big eight" accounting firms

refused to testify against other accounting firms, Attorney Walter Stratton ultimately found a

Professor of accounting named Douglas Carmichael who was widely published, but did not have

much experience as an expert witness.[87]  Shortly after Enron failed, Professor Carmichael was

appointed to chair to the Public Accountancy Standards Board to oversee accounting firms like

---

[82] *Id.* at ¶ 380.

[83] *Id.*

[84] Trans. Dec. 11, 2012 at 46:4-9.

[85] *Id.* at 46:9-14.

[86] *Id.* at 47:8-21.

[87] *Id.* at 47-48.

Arthur Andersen.[88]    Attorney Russell attributes his testimony at trial as one of the factors that prompted E&Y to reinitiate settlement discussions.[89]

  B. <u>The AK Application</u>[90]

  Andrews Kurth filed the AK Application on November 15, 2012.  Because the relief requested in the AK Application is more expansive than a single interim pay period, it is helpful for purposes of discussion to divide the requests into distinct categories.  I note, however, that the categories I have assigned are not necessarily identical to those used by Andrews Kurth because mine are based on conceptual similarities that will facilitate a clearer analysis.

  The first category contains the fees, expenses, and 50% of the travel time incurred in from March 1, 2011 through September 30, 2012 (the "53rd Pay Period").  The following table summarizes the details of the Andrews Kurth professionals who rendered services during the 53rd Pay Period:

---

[88] *Id.* at 48:14-21.

[89] *Id.* at 49:11-15.

[90] As is not uncommon with fee applications, the AK Application contains numerical inconsistencies.  Most appear to be mistakes made while transposing the figures from one place to another, while a few others are simply mathematical errors.  In any event, the figures contained herein shall control.

| Professional | Title | Expertise | Hourly Rate | Hours Billed | Total Fees | Year Admitted |
|---|---|---|---|---|---|---|
| Robin Russell (2011) | Partner | Bankruptcy | $745 | 133.20 | $99,234.00 | 1986 |
| Robin Russell (2012) | Partner | Bankruptcy | $795 | 234.10 | $186,109.50 | 1986 |
| Roy Bertolatus | Partner | Corporate | $765 | 34.30 | $26,239.50 | 1977 |
| Allison Mantor | Partner | Tax | $650 | 1 | $650.00 | 1989 |
| Chasless Yancy | Associate | Bankruptcy | $475 | 61.50 | $29,212.50 | 2001 |
| Chasless Yancy | Associate | Bankruptcy | $500 | 236.20 | $118,100.00 | 2001 |
| Linda Wilson | Legal Assistant | Corporate | $295 | 9.50 | $2,802.50 | N/A |
| Debbie Weatherford | Legal Assistant | Bankruptcy | $230 | 1 | $230.00 | N/A |
| Debbie Weatherford | Legal Assistant | Bankruptcy | $255 | 9.30 | $2,371.50 | N/A |
| | | | **TOTAL** | **720.10** | **$464,949.50** | |

The total fees requested are broken down into the following project headings:

| Category | Brief Description of Services | Total Hours | Requested Fees |
|---|---|---|---|
| Junior/Senior Distribution | | 253 | $168,973.00 |
| Bankruptcy Administration | Day to day issues which arise in administering the estate, including preparing six month report and compiling information request by Internal Securities. | 4.10 | $3,054.50 |
| Tax Matters | Advising Dr. Branch with respect to tax matters, including work regarding the § 503(b) status. | 88.30 | $63,490.00 |
| Final Fee Applications | Preparing the AK Application. | 122.10 | $65,717.50 |
| Estate Closure | Preparing final tax returns, Dr. Branch's final report, and motions to determine tax liability with respect to 2011 and 2012, abandon stock, and destroy records. | 252.60 | $163,714.50 |

In addition to the fees requested, Andrews Kurth seeks reimbursement of $17,807.03 in reasonable expenses and, consistent with the Fee Decision, $3,180.00 as 50% of its travel time.

The next category of requests contained within the AK Application is for fees and expenses incurred during the month of October, 2012. In the AK Application, Andrews Kurth represents that its accounting department reported gross fees of $92,000 and gross expenses of

$368.94 for the period of October 1, 2012 to October 31, 2012.  In the conclusion section of the AK Application, however, the fees requested are listed as $70,807.[91]  Although these fees and expenses are based on actual billings, no itemized time entries or substantiating documents were attached to the AK Application or have been filed with respect to these charges.

The third category of requests consists of estimated fees and expenses for the period of November 1, 2012, through December 11, 2012, the date the final report was heard (the "Stub Period").  Andrews Kurth estimated its fees for this period as follows:

| Professional | Hourly Rate | Estimated Hours | Requested Fees |
|---|---|---|---|
| Robin Russell | $795 | 100 | $79,500.00 |
| Chasless Yancy | $500 | 25 | $12,500.00 |
| | **TOTAL** | **125** | **$92,000.00** |

The services included within this estimate are: working with the United States Trustee to resolve any issues with the final report; filing the final tax determination motion; negotiating with the IRS regarding the turnover of the final tax refunds; completing and filing the final fee applications; and attending the December 11, 2012 hearing.  Additionally, Andrews Kurth estimated that it would incur reasonable expenses in the amount of $23,619.37 providing the 4,023 claimants with notice of the final report and final fee applications through mailing and publication, providing copies of the final report and final fee applications to the fifty-four allowed claimants, and traveling to Boston for the December 11, 2012 hearing.  Based on prior trips, Andrews Kurth estimated its travel time as $3,180.

---

[91] One explanation for this difference may be that Andrews Kurth appropriately reviewed its *gross* receipts and reduced them to $70,807.  For reasons explained below, I need not resolve this inconsistency.

The fourth category is comprised of the Deferred Requests—various fees and expenses that Andrews Kurth either previously deferred or that I disallowed expressly or implicitly in the Fee Decision.[92]  The Deferred Requests are summarized in the following table.

| | |
|---|---|
| FDIC Litigation Interim Fee Reductions | $310,193.78 |
| E&Y Litigation Interim Fee Reductions | $262,750.30 |
| Boston Housing | $140,764.70 |
| Deal/Deposition/Trial Meals | $59,386.59 |
| Secretarial/Staff Overtime (Litigation) | $41,340.19 |
| Special Supplies | $4,955.72 |
| Document Management | $63,189.20 |
| 50% Travel Time Through 52nd Pay Period | $850,018.70 |
| 50% Travel Time for 53rd Pay Period[93] | $3,180.00 |
| 50% Travel Time for Stub Period[94] | $3,180.00 |
| **TOTAL** | **$1,738,959.18** |

Andrews Kurth notes that this is only a portion of the $3,033,467.50 in fees and expenses that I have disallowed or it has voluntarily absorbed on an interim basis.[95]

The final category is a fee enhancement to which, as will be discussed more fully below, Andrews Kurth asserts that it is entitled based on its exceptional services and the results obtained in this case.  Andrews Kurth requests that the enhancement take the form of a 10% multiplier applied to the three project categories where its services yielded the most exceptional results.  Accordingly, Andrews Kurth calculates the enhancement thusly:

---

[92] *See In re Bank of New England Corp.*, 134 B.R. at 460-465.

[93] The treatment of this amount is inconsistent in the AK Application.  On the one hand, it is omitted from the initial request for travel time incurred in the 53rd Pay Period.  Later, however, it is added into the total travel time incurred during the 53rd Pay Period.  As the general rule in this case has been to award only 50% travel time, it is more appropriately grouped and considered with this class of expenses.

[94] The AK Application includes this amount in the Stub Period travel time request.  Again, because the general rule in this case has been to award only 50% travel time, it is more appropriately grouped and considered with this class of expenses.

[95] I note that the total fees and expenses that have been disallowed or not requested have no bearing on whether the fees and expenses that have been requested in the AK Application are reasonable and compensable.

| | |
|---|---|
| Taxes | $1,214,130.30 |
| FDIC Litigation | $10,887,664.00 |
| E&Y Litigation | $12,779,506.49 |
| **Subtotal of Categories** | **$24,881,300.79** |
| Lodestar Multiplier | 10% |
| **TOTAL** | **$2,488,130.07** |

In sum, Andrews Kurth requests the following amounts in the AK Application:

| | |
|---|---|
| Fees Requested for 53rd Pay Period | $464,949.50 |
| Expenses Requested for 53rd Pay Period | $17,807.03 |
| Travel Time Requested for 53rd Pay Period | $3,180.00 |
| **Subtotal for 53rd Pay Period** | **$485,936.53** |
| Fees Requested for October 2012 | $92,000.00 |
| Expenses Requested for October 2012 | $368.94 |
| **Subtotal for October 2012** | **$92,368.94** |
| Fees Requested for Stub Period | $92,000.00 |
| Expenses Requested for Stub Period | $23,619.37 |
| Travel Time Requested for Stub Period | $3,180.00 |
| **Subtotal for Stub Period** | **$118,799.37** |
| FDIC Litigation Interim Fee Reductions | $310,193.78 |
| E&Y Litigation Interim Fee Reductions | $262,750.30 |
| Boston Housing | $140,764.70 |
| Deal/Deposition/Trial Meals | $59,386.59 |
| Secretarial/Staff Overtime (Litigation) | $41,340.19 |
| Special Supplies | $4,955.72 |
| Document Management | $63,189.20 |
| 50% Travel Time Through 52nd Pay Period | $850,018.70 |
| 50% Travel Time for 53rd Pay Period | $3,180.00 |
| 50% Travel Time for Stub Period | $3,180.00 |
| **Subtotal of Deferred Requests** | **$1,738,959.18** |
| | |
| **Enhancement (10% Lodestar Multiplier)** | **$2,488,130.07** |
| | |
| **Total Requested in AK Application** | **$4,924,194.09** |
| | |
| Fees Awarded Through 52nd Pay Period | $30,411,944.11 |
| Expenses Awarded Through 52nd Pay Period | $2,947,880.79 |
| Travel Time Awarded Through 52nd Pay Period | $850,018.70 |
| **Subtotal Through 52nd Pay Period** | **$34,209,843.60** |
| | |
| **TOTAL REQUEST**<br>**(All Awards and Interim Payments)** | **$39,134,037.69** |

C.  The Branch Application

The Branch Application was also filed on November 15, 2012.  Dr. Branch seeks compensation in the amount of $5,286,525.65 for all interim periods and the period between March 1, 2007, and November 9, 2012, for which no interim compensation was requested.  To date, he has been paid interim compensation in the amount of $5,281,123.04, plus reimbursement of expenses in the amount of $11,177.14.  Therefore, Dr. Branch requests total final compensation in this case of $10,567,648.69.

The $10,567,648.69 Dr. Branch requests represents the maximum commission allowable under 11 U.S.C. § 326(a) based upon the distributions made in this case.  He states, however, that he has devoted 17,946.30 hours to work on the estate and 2,404.70 hours in travel time.[96]  If his regular hourly rate were applied, which has ranged from $300 to $850, he would be entitled to approximately $9,295,087.  Thus, under a lodestar analysis, granting Dr. Branch the maximum commission exceeds his reasonable hourly compensation by $1,272,561.69—13.7% over his hourly rate.

## III. POSITIONS OF THE PARTIES

Andrews Kurth

In the interests of clarity and expediency, I will limit this section to Andrews Kurth's arguments in support of the enhancement.  I will address the arguments in support of the Deferred Requests in my analysis below without first stating them here.

To start, Andrews Kurth notes that I recognized the possibility of an enhancement in the Fee Decision when I observed that "[i]f . . . the claim results in vast sums flowing into the estate,

---

[96] Docket No. 2526, Ex. 9-C.

27

it would not be inappropriate for counsel to seek something in excess of its normal rates."[97]   In

support of the enhancement, Andrews Kurth asserts that it was uniquely suited to represent Dr.

Branch in this case and that he picked Andrews Kurth because he needed specialized skills not

amply reflected among local attorneys.   Indeed, Andrews Kurth obtained experience with bank

holding company bankruptcies during its engagement in the First Republicbank Corporation

bankruptcy.   Moreover, it notes that as an out of state firm, Andrews Kurth, unlike most Boston

attorneys, did not have any conflicts with BNEC.

> Explaining the exceptional results achieved in this case, the AK Application states:
>
> Believed to be administratively insolvent on the day it was filed, the Estate
> ultimately paid its senior bondholders in full, made a distribution in excess of
> 35% to unsecured creditors and distributed over $74 million to the Junior
> Indenture Trustees.   The Estate avoided administrative insolvency through
> successful implementation of a sophisticated tax strategy and collected
> $374,687,361.56, on behalf of itself and its wholly-owned subsidiaries on a
> consolidated basis, in gross receipts from asset sales, liquidation of subsidiaries,
> litigation recoveries and optimum management of cash prior to distribution.[98]

Indeed, Andrews Kurth asserts that it has brought value to the estate that is worth over ten times

what it received in interim fees.   Nevertheless, Andrews Kurth has not requested an enhancement

for all its successful work, but limited its request to "[t]he three projects [that] involved the very

highest legal, economic, strategic, and tactical barriers to recovery, and the results . . . obtained

were far beyond the ordinary expectations of even the most competent law firms."[99]   Andrews

Kurth also disputes the notion put forward by the Junior Indenture Trustees that enhancement is

inappropriate where the unsecured creditors have not been paid in full.

---

[97] *In re Bank of New England Corp.*, 134 B.R. at 463.

[98] Docket No. 2478 at ¶ 25.

[99] Docket No. 2526 at ¶ 14.

Additionally, Andrews Kurth argues that it faced substantial risk of nonpayment until December, 1998, when all the tax issues were finally resolved.  As explained above, had the tax claims not been litigated and settled, the estate would have been rendered administratively insolvent.  Moreover, Andrews Kurth did not receive any interim compensation for the first nine months of the case, requiring the firm's managing partners to issue waivers in order to continue representing Dr. Branch.

In sum, Andrews Kurth posits that the requested enhancement is not a "bonus," but another way to arrive at a comparable rate.  It asserts that its hourly rates were several hundred dollars less than those of Davis Polk & Wardell ("Davis Polk") during the E&Y litigation and Peabody & Arnold and Sullivan & Cromwell in the FDIC litigation.  Accordingly, Andrews Kurth concludes that its rates were below market for providing the same services.

Dr. Branch

Dr. Branch supports the AK Application in its entirety.  With respect to his own application, he notes that the United States District Court for the District of Massachusetts previously observed "that Dr. Ben Branch, having done a truly remarkable job of marshaling BNEC's assets, has paid the principal of the Senior Debt in full, together with all pre-petition interest, post-petition fees, and the Senior Debt holders' expenses."[100]  In addition to successfully managing the accumulated cash to allow for the resolution of BNEC's tax issues and the prosecution of the various litigations, Dr. Branch has used his expertise in finance to earn $33,104,753.42 in interest on the funds brought into the case over the years.  In further support of his enhancement, he states that unlike other professionals in this case, his compensation has been delayed years longer.

---

[100] *HSBC Bank USA v. Bank of New England Corp. (In re Bank of New England Corp.)*, 295 B.R. 419, 421 (D. Mass. 2003) *vacated and remanded*, 364 F.3d 355 (1st Cir. 2004).

The United States Trustee

While the United States Trustee does not object to the Branch Application, he does object to the AK Application in three respects. First, the United States Trustee asserts that in the Fee Decision, I "made it clear that 'generally speaking, it will not permit fees to be paid from the estate for travel time greater than those which would be incurred if the professional's office were within the district.'"[101]   As such, the United States Trustee argues that Andrews Kurth, in contravention of that holding, seeks final allowance of the remaining 50% of its travel time. Similarly, the United States Trustee objects to any meal allowance because I previously adopted a general rule disapproving of charging meals in the Fee Decision.

Lastly, the United States Trustee, noting that the United States Court of Appeals for the First Circuit has previously stated that enhancements to the lodestar are rare, asserts that Andrews Kurth has failed to demonstrate one is appropriate in this case. Recognizing that Andrews Kurth is a "very good firm",[102] the United States Trustee contends that Dr. Branch likely retained them with the reasonable expectation that their experience and capabilities would meet the very challenges that emerged, and that Andrews Kurth would charge its customary rates to do so. Despite the "excellent representation, excellent service, and excellent results,"[103] the United States Trustee asserts that Andrews Kurth's blended hourly rate is somewhat high for this circuit and more than fairly compensates them for the services rendered. As such, a lodestar enhancement is unwarranted in this case.

---

[101] Docket No. 2506 at ¶ 28 (*quoting In re Bank of New England Corp.*, 134 B.R. at 454-455).

[102] Trans. Dec. 11, 2012 at 66:1-2.

[103] *Id.* at 66:8-9.

The Junior Indenture Trustees

First, the Junior Indenture Trustees object to the payment of any expenses related to Secretarial/Staff Overtime or Special Supplies. With respect to the former, they argue that while I left the door open to such costs in the Fee Decision, Andrews Kurth has not demonstrated that reimbursement is appropriate due to "irresistible time pressures."[104] As to the latter, the Junior Indenture Trustees object to reimbursement of any supplies, including boxes, notebooks, and dividers, which are general items of overhead that any law firm of comparable stature would maintain for general purposes. Similarly, the Junior Indenture Trustees argue that Andrews Kurth's request for the remaining 50% of its travel time is non-compensable pursuant to my prior holding in the Fee Decision.

Next, the Junior Indenture Trustees assert that I should not grant Andrews Kurth an enhancement. Although they agree that Andrews Kurth performed high quality work and obtained commendable results in this case, they contend that the lodestar calculated fees are presumptively sufficient compensation. The Junior Indenture Trustees argue that the AK Application does not demonstrate that the work performed or results achieved involved services not generally required or expected from estate professionals. Indeed, they assert that Andrews Kurth did nothing exceptional beyond the scope of services reasonably contemplated at the time of their retention. In support, the Junior Indenture Trustees note that Andrews Kurth was well aware at the outset of the case that any successful liquidation would rely on substantial litigation with both the IRS and FDIC. For this reason, they similarly contend that the results—a 35% dividend to junior bondholders—while good, do not far exceed the reasonable expectations at the start of the case and justify an enhancement. The Junior Indenture Trustees also argue that an

---

[104] *In re Bank of New England Corp.*, 134 B.R. at 456.

enhancement is unwarranted where the party funding the enhancement has not been made whole and does not consent.  Lastly, they dispute that Andrews Kurth faced a substantial risk of nonpayment because BNEC had assets, though illiquid, and they received interim compensation within the first year of the case.

The Junior Indenture Trustees also object to the Branch Application on the basis that they believe it purports to award Dr. Branch an enhancement.  They argue that 3% commission on distributions exceeding one million dollars contained within 11 U.S.C. § 326(a) is a cap and compensation at that level is not presumptively reasonable.  In contrast, the Junior Indenture Trustees urge that a lodestar analysis of Dr. Branch's compensation is presumptively reasonable. They further assert that I acknowledged this by awarding Dr. Branch interim compensation at 50% of the statutory maximum.

### The Pro Se Objections

The six pro se objectors, who are all junior bondholders, oppose Andrews Kurth's enhancement asserting that it is "excessive,"[105] "over the top,"[106] and "greedy."[107]  They note that they have waited over twenty years for to receive any distribution, while Andrews Kurth has been paid approximately $34,000,000 to date.  With varying levels of vitriol, they all argue that it is unfair for Andrews Kurth to receive a bonus on top of their reasonable compensation while they have yet to be made whole.

---

[105] Docket No. 2524.

[106] Docket No. 2508.

[107] Docket No. 2500.

## IV. <u>DISCUSSION</u>

### A.   <u>The AK Application</u>

"The standards for allowance of fees for actual and necessary services and reimbursement of expenses are well known to practitioners before this Court, and are set forth not only in numerous decisions in this circuit . . . but in 11 U.S.C. § 330(a)(3)(A) as well."[108]   Indeed, as Andrews Kurth knows well, I previously explored these standards thoroughly in the Fee Decision with respect to the first interim applications filed in this case.   Accordingly, they will not be repeated here.

#### 1. The 53rd Pay Period

I have reviewed the itemized billing entries, summary of expenses, travel expense itemization, and travel log for the 53rd Pay Period.   With the exception of a cab fare costing $92.50 that Attorney Russell incurred traveling from the airport to her residence in Texas, I find the fees, expenses, and travel time to be reasonable.   Accordingly, I will allow fees in the amount of $464,949.50, reimbursement of expenses in the amount of $17,714.53, and travel time in the amount of $3,180 with respect to this period.

#### 2. October 2012

As explained above, in the AK Application, Andrews Kurth represents that its accounting department reported gross fees of $92,000 and gross expenses of $368.94 for the month of October, 2012.   Later, however, it listed the fee request for this period as $70,807.   The difference is irrelevant.   These fees are not supported by itemized time entries and are wholly

---

[108] *In re Tundra Corp.*, 243 B.R. 575, 581 (Bankr. D. Mass. 2000) (*citing Boston & Maine Corp. v. Moore*, 776 F.2d 2 (1st Cir. 1985); *In re Smuggler's Beach Properties, Inc.*, 149 B.R. 740 (Bankr. D. Mass. 1993); *In re Bank of New England Corp.*, 134 B.R. at 450, *aff'd*, 142 B.R. 584) (textual citations omitted).

unsubstantiated.    Accordingly, all fees and expenses for the month of October, 2012, are disallowed.

### 3. The Stub Period

In the AK Application, Andrews Kurth requested $92,000 in fees for the Stub Period which it estimated it would incur based upon Attorney Russell billing 100 hours at $795 per hour and Attorney Yancy billing 25 hours at $500 per hour.  Since the filing of the filing of the AK Application, Attorney Russell has represented that the actual billings far exceed the estimate. While fees must be substantiated, I recognize that substantial fees can still be incurred between the date of the filing of a final fee application and the date the final report is approved.  Under such circumstances, a reasonable estimate is appropriate.  Given the number of objections and responses filed since November 15, 2012, and the length of the December 11, 2012 hearing, I have no trouble finding that $92,000 is a reasonable estimate.  Therefore, the fees for the Stub Period are allowed as requested.

With respect to Stub Period expenses, Andrews Kurth attached an estimated itemization for its requests which I find reasonable.[109]  As such, I will allow reimbursement of expenses in the amount of $23,619.37.  I will also approve 50% of Attorney Russell's travel time to attend the December 11, 2012 hearing in the amount of $3,180.

### 4. The Deferred Requests

#### a. The FDIC Litigation Interim Fee Reductions

Andrews Kurth requests that it be allowed $310,193.78 with respect to fees incurred in the FDIC litigation, which it agreed to withdraw from its prior applications to avoid objections from the FDIC.  The fees were withdrawn on an interim basis only and without prejudice to

---

[109] Docket No. 2478, Ex. 8-A.

renewal.  The United States Trustee does not object to the allowance of these fees.  Although the Junior Indenture Trustees initially objected to this amount, they have since withdrawn their objection.   Accordingly, the request for these fees is allowed.

### b. The E&Y Litigation Interim Fee Reductions

Next, Andrews Kurth requests $262,750.30 for fees incurred in the E&Y litigation that were previously deferred.  The firm explains that to help manage the escalating costs of the E&Y litigation, it offered Dr. Branch an interim discount with the understanding that Andrews Kurth could seek to recover the fees in a final fee application if the E&Y litigation was successful.  Dr. Branch supports the allowance of these fees and no other party has objected.  The request is allowed.

### c. Boston Housing Expenses

Andrews Kurth seeks reimbursement of Boston housing expenses in the amount of $140,764.70.  In order to avoid excessive hotel costs and meal expenses, Andrews Kurth rented apartments in Boston for two of its attorneys.  The first apartment was rented for Attorney Russell from July, 1991, to December, 1998.[110]  The monthly rent for the apartment was $1,200, but it was reduced by $400 from September, 1991, to May, 1992, when Attorney Russell's husband lived with her and provided reimbursement to Andrews Kurth.[111]  The monthly utility costs for the apartment were modest, ranging from approximately $20 to $100 per month, with winter months generally being higher.[112]   The following table summarizes the apartment's usage:[113]

---

[110] Docket No. 2478, Ex. 7.

[111] *Id.*

[112] *Id.*

[113] Docket No. 2525, Ex. B.

| Year | Number of Nights Stayed |
|------|-------------------------|
| 1991 | 167 |
| 1992 | 328 |
| 1993 | 288 |
| 1994 | 253 |
| 1995 | 248 |
| 1996 | 233 |
| 1997 | 194 |
| 1998 | 155 |

The second apartment was rented for Attorney Higgason from September, 1993, to October, 1995.[114]  The monthly rent for this apartment was $1,300 including utilities.[115]  The following table summarizes the second apartment's usage:[116]

| Year | Number of Nights Stayed |
|------|-------------------------|
| 1993 | 79 |
| 1994 | 261 |
| 1995 | 198 |

In light of Boston hotel rates ranging from $124 to $204 from 1991 to 1998, Andrews Kurth estimates that the apartments saved the estate $232,369.08.[117]  The United States Trustee does not object to this expense, and the Junior Indenture Trustees have withdrawn their objection.

While I was admittedly uncomfortable with the cost of non-local counsel in the Fee Decision, I nevertheless allowed Andrews Kurth their full travel expenses, including hotel fees. Given how much time counsel was required to be in the district, renting apartments was an appropriate cost containment measure.  Therefore, reimbursement of the Boston housing expenses will be allowed.

---

[114] Docket No. 2478, Ex. 7.

[115] *Id.*

[116] Docket No. 2525, Ex. B.

[117] *Id.*

d. Meal Expenses

Although I adopted a general rule disallowing meal expenses as "an item of personal overhead" in the Fee Decision, Andrews Kurth requests that I allow reimbursement of meal expenses in the amount of $59,386.59 for meals provided to working groups, attorneys, staff, and witnesses during sale closings, depositions, and trial preparation. Andrews Kurth asserts that these meals were not provided for pleasure but for sustenance, and they conferred an economic benefit to the estate because it eliminated the need to interrupt negotiations, depositions, and trial preparation with lengthy breaks outside the building. The United States Trustee objects citing my general rule.

In the Fee Decision, I articulated a number of general rules, but noted "that these rules may be subject to exceptions in clearly demonstrated special circumstances."[118] While a "mission critical" meal exception might prove to be reasonable exception to the general rule, I find that application of such an exception is inappropriate in this case for several reasons. While counsel assures me that this lump sum represents only critical meals of modest expense, I have no way to verify that under the circumstances. Specifically, I have no information regarding when these meals were consumed, how many people were served, what was served, or what it cost. Admittedly, I would be reluctant to delve into the details of every meal and second guess its necessity and reasonableness, but it seems that any narrow exception to the general rule of disallowance would require some level of scrutiny. The present request precludes any scrutiny. There is simply no way for me to gauge the reasonableness of a lump sum in the approximate amount of $60,000 for meals provided over several years. As such, the request for reimbursement of meal expenses is disallowed.

---

[118] *In re Bank of New England Corp.*, 134 B.R. at 453.

### e. Secretarial/Staff Overtime

Andrews Kurth requests $41,340.19 for Secretarial/Staff Overtime.  Heeding my warning in the Fee Decision that "secretarial overtime is overhead . . . . [a]bsent irresistible time pressures,"[119] Andrews Kurth requests only the overtime "directly related to the time deadlines imposed by the FDIC and E&Y Litigation scheduling orders and E&Y trial . . . ."[120]  The Junior Indenture Trustees object, asserting that there has been no showing that the request is, in fact, related to "irresistible time pressures."

Although I articulated an exception for "irresistible time pressures" to the general rule that secretarial overtime is overhead, I also noted that exceptions apply only "in *clearly demonstrated* special circumstances."[121]  While I have no trouble accepting that deadlines in both the FDIC and E&Y litigations reasonably required secretarial overtime that would fall within the exception, a lump sum in the final fee application with no substantiating documentation simply does not fit the bill.  At very least, I would expect to see some kind of itemization demonstrating a correlation between the overtime incurred and the impending deadlines that purportedly necessitated it.  Accordingly, this request must be disallowed.

### f. "Special" Supply Expenses

Andrews Kurth requests reimbursement for "special" supplies in the amount of $4,955.72.  These extraordinary supplies necessitated by the FDIC and E&Y litigations.  They include, but are not limited to, special boxing to ship trial exhibits and video equipment from Houston, Texas, to Boston, Massachusetts for the E&Y trial and large quantities of notebooks

---

[119] *In re Bank of New England Corp.*, 134 B.R. at 456.

[120] Docket No. 2478 at ¶ 43.

[121] *In re Bank of New England Corp.*, 134 B.R. at 453 (emphasis added).

and dividers.  As previously stated, the Junior Indenture Trustees object to reimbursement on the grounds that these expenses are simply overhead.  Particularly in the absence of any itemization or more compelling information, I must agree.  Absent "clearly demonstrated special circumstances,"[122] boxes, notebooks, and dividers are basic office supplies that are included in any law firm's overhead.  Therefore, the request for reimbursement is disallowed.

### g. Document Management Expenses

Andrews Kurth requests reimbursement of expenses in the amount of $63,189.20 for document management costs.  In support, Andrews Kurth explains that millions of pages of documents were produced in connection with both the FDIC and E&Y litigations that required offsite storage and retrieval.  Additionally, at the conclusion of certain matters, I have allowed certain documents to be destroyed.  I note that while there are no objections to this request, Andrews Kurth has not offered any documentation in support.  That said, document management expenses are customarily reimbursed and, given the size, complexity, and length of this case, I have no trouble finding the amount requested to be reasonable.  Therefore, *under the unique circumstances of this case*, I will approve the document management costs in the amount requested despite the absence of any documentation substantiating the claim.

### h. Remaining 50% Travel Time

In the Fee Decision, I adopted a general rule that

[t]he Court may indulge a debtor, trustee, or committee desiring to retain professionals from outside of the district in a case which could be handled by local persons, but, generally speaking, it will not permit fees to be paid from the estate for travel time greater than those which would be incurred if the professional's office were within the district.

* * *

---

[122] *Id.*

If the debtor/trustee/committee wishes to obtain the services of professionals beyond the limits of the district, they may be approved, but on the same terms as local professionals.[123]

Recognizing that Andrews Kurth, a Texas firm, had been retained before I articulated this standard, I allowed Andrews Kurth, as an equitable accommodation, 50% of its standard rates for travel time. [124]  This practice has continued throughout the pendency of this case.

Andrews Kurth now seeks the other half of its travel time in the amount of $856,378.70,[125] citing another passage of the Fee Decision which states:

> In the general considerations which preface this opinion, the Court held that professionals outside of the District might be compensated for "external" travel time and expenses *only if they provided a type of services not available on the local market; otherwise they would receive the same allowances for travel as would professionals based in the District*. Approved travel time is to be compensated at the professional's full billing rate.[126]

Andrews Kurth, of course, argues that the results which have been achieved in this case could not have been achieved by another law firm.  Both the United States Trustee and the Junior Indenture Trustees object.

But for the word "might," the quoted passage upon which Andrews Kurth relies would appear to be inconsistent with the general rule that professionals outside the district could be retained on the same terms as local professionals.[127]  Notwithstanding the reference to an exception that is apparently absent from the preliminary considerations portion of the Fee

---

[123] *Id.* at 454-455.

[124] *Id.* at 464 ("Perhaps unknowingly, A & K has provided the Court with an equitable solution to the problem of travel time. The Court will allow A & K its requested 50% of standard rates for travel time . . . .").

[125] Andrews Kurth requests $850,018.70 for travel time incurred in the first fifty-two interim pay periods, plus $3,180 incurred in the 53rd Pay Period, plus $3,180 incurred in the Stub Period.

[126] *In re Bank of New England Corp.*, 134 B.R. at 464 (emphasis added).

[127] *Id.* at 454-455.

Decision, I find that such an exception, though reasonable, should not apply in this case.  Before considering Andrews Kurth's first interim application, I emphasized that I found "the services provided by A & K to the chapter 7 trustee to be of extremely high quality."[128]  That said, I still refused to allow Andrews Kurth more than 50% of its travel time despite its experience with bank holding company bankruptcies.  Twenty-one years later, I continue to find their services to be of extremely high quality, but am I unwilling to conclude that no local firm could have provided the same services and achieved the same results.  Therefore, Andrews Kurth's request for the remaining half of its travel time is disallowed.

5. Enhancement

In the Fee Decision, I hypothesized that if, at the end of the case, vast sums flowed into the estate based upon counsel's services, "it would not be inappropriate for counsel to seek something in excess of its normal rates."[129]  With respect to fee enhancements, the First Circuit in *Lipsett v. Blanco* explained:

> The Supreme Court has stated that, in some cases, the lodestar may not actually represent a reasonable attorneys' fee, and thus, may require upward adjustment. *See Blum [v. Stenson]*, 465 U.S. [886] at 897, 104 S.Ct. [1541] at 1548 [1984]; *Hensley [v. Eckerhart]*, 461 U.S. [424] at 435, 103 S.Ct. [1933] at 1940 [1983]. But, we have repeatedly cautioned that such enhancements will be rare. *See, e.g., Wildman v. Lerner Stores Corp.*, 771 F.2d 605, 610 (1st Cir.1985). The exception is a tiny one-and we will not permit it to eclipse the rule.[130]

---

[128] *Id.* at 460.

[129] *Id.* at 463.

[130] *Lipsett v. Blanco*, 975 F.2d 934, 942 (1st Cir. 1992).

While there is general agreement that "[u]pwards adjustments in bankruptcy cases are permissible provided the application shows rare and exceptional circumstances,"[131] the "'rare' and 'exceptional' standard is devoid of any analytical utility."[132]

In *In re Pub. Serv. Co. of New Hampshire*, Judge Yacos of the District of New Hampshire cogently explained at length the logical difficulties inherent in the concept of enhancement.[133]  Put simply, several of the factors courts have looked to in support of an enhancement, such as quality of the services rendered, the novelty or complexity of the issues presented, and the results achieved, are already built into the lodestar analysis.[134]  Struggling to synthesize a viable standard, Judge Yacos reasoned:

> In short, applicants for professional fee awards in bankruptcy cases can request an upward adjustment of the objective lodestar fee determination but must meet the burden of overcoming the presumption created by the appellate case decisions that the hourly rates of an experienced professional in the specialty involved should equate to a reasonable fee. Moreover, that burden is to be deemed stringent by virtue of those decisions. It can not be overcome by generalized rhetoric of "success" and "value" but only by a specific showing of exceptional activity *without which* the estate likely would not have achieved the results obtained by other specialists of like background and rates, or exceptional activity *beyond that* reasonably contemplated at the time of the original retention. What facts are required for the "without which" portion of that showing necessarily will vary from case to case. In that context the bankruptcy court is entitled to receive from the applicant not a smoking gun but a "smoking silver platter" upon which the serving of the blessedly rare cut of economic nutrient for the estate is self-evident in all its steaming glory.[135]

---

[131] *ASARCO, LLC v. Baker Botts, LLP (In re ASARCO, LLC)*, 477 B.R. 661, 672 (S.D. Tex. 2012).  *See, e.g., In re El Paso Refinery, L.P.*, 257 B.R. 809, 835 (Bankr. W.D. Tex. 2000); *Globe Distributors, Inc. v. Adolph Coors Co. (In re Globe Distributors, Inc.)*, 145 B.R. 728 (Bankr. D.N.H. 1992); *In re WHET, Inc.*, 61 B.R. 709 (Bankr. D. Mass. 1986).

[132] *In re Pub. Serv. Co. of New Hampshire*, 160 B.R. 404, 418 (Bankr. D.N.H. 1993).

[133] *Id.* at 418-420.

[134] *Boston & Maine Corp. v. Sheehan, Phinney, Bass & Green, P.A.,* 778 F.2d 890, 894 n.1 (1st Cir. 1985).

[135] *In re Pub. Serv. Co. of New Hampshire*, 160 B.R. at 420-421 (emphasis in original, footnotes omitted).

Other courts have recognized that two factors which are distinct from the lodestar analysis, but are highly relevant to the appropriateness of an enhancement, include whether the party paying for the fee agreed to it[136] and whether all creditors have been paid in full.[137] Ultimately, whether an enhancement is warranted is a matter left to the court's discretion.

Having reviewed the record in this case and considered the arguments of the parties, I conclude that an enhancement is not appropriate. Without question, the services provided to Dr. Branch by Andrews Kurth have been of extremely high value—perhaps even exceptional—but one could reasonably assume, given their background and experience, that this was precisely why Dr. Branch retained them in the first place, in which case their lodestar should be sufficient compensation. Additionally, Andrews Kurth was aware at the outset of the case that any successful liquidation would rely on substantial litigation with both the IRS and FDIC.[138] The E&Y litigation too was foreseeable. Given the size and complexity of BNEC's case, I am reluctant to say that the scope of those litigations though epic, was wholly unforeseen. I am also not persuaded that higher fees paid to their litigation opponents reflect that Andrews Kurth's

---

[136] *In re ASARCO, LLC*, 477 B.R. at 673; *In re El Paso Refinery, L.P.*, 257 B.R. at 839.

[137] *In re Chewning & Frey Sec., Inc.*, 328 B.R. 899, 915 (Bankr. N.D. Ga. 2005); *In re Blue Coal Corp.*, 206 B.R. 721, 723 (Bankr. M.D. Pa. 1997); *In re U.S. Lines, Inc.*, 103 B.R. 427, 434 (Bankr. S.D.N.Y. 1989) *aff'd*, 90 CIV. 3823 (MGC), 1991 WL 67464 (S.D.N.Y. Apr. 22, 1991); *In re D.W.G.K. Restaurants*, 106 B.R. 194, 197 (Bankr. S.D. Cal. 1989); *see also CRG Partners Grp., LLC v. Neary (In re Pilgrim's Pride Corp.)*, 690 F.3d 650, 666 (5th Cir. 2012), *as revised* (Aug. 14, 2012) (noting that the circuit has never sustained an enhancement where all creditors did not receive a 100%); *but see In re Chary*, 201 B.R. 783, 788 (Bankr. W.D. Tenn. 1996) (Chapter 7 trustee's counsel entitled to enhancement where remarkable efforts resulted in a 40% recovery to creditors); *Matter of Baldwin-United Corp.*, 79 B.R. 321 (Bankr. S.D. Ohio 1987) (counsel entitled to enhancement where creditors will receive almost 60 cents on the dollar).

[138] Perhaps Andrews Kurth has done too good a job summarizing the tax issues in this case because I do not see the "sophisticated strategy" it touts in support of enhancement. While the numbers are certainly much higher than the average case before this Court, BNEC's tax exposure on account of the 1989 Refund is not unlike the tax issues in most cases. Just like many other cases, the tax claim was negotiated and resolved by stipulation. Without a doubt, this was a good result for the estate, but, as described by Andrews Kurth, I cannot say that it was the result of truly exceptional services. Similarly, the disaffiliation of the Bridge Banks saved the estate from hundreds of millions of dollars in imputed income from FFA, but aside from the novelty of doing so based upon a recent change in the applicable regulations, I cannot say other professionals, particularly those of similar background, would not have adopted the same strategy.

rates were so below market value to warrant an upward adjustment.[139]   Moreover, though I appreciate the risks borne by counsel early in this case, particularly in light of the threat of administrative insolvency due to large tax claims, Andrews Kurth was aware of these problems when they were retained.   In sum, Andrews Kurth has not rebutted the presumption that the lodestar is adequate compensation.

Lastly, I note that many cases hold that payment of creditors in full is an important factor, if not a prerequisite, for the award of an enhancement.  Although I can fathom the existence of a case where an enhancement may be appropriate when the unsecured creditors have received less than full repayment, such a case would be the rarest of the rare.  Otherwise, we are left with the situation, as here, where the client (the Chapter 7 trustee) seeks to pay its counsel an amount not contemplated by the terms of the retention agreement from the creditor's pocket.  When the creditor then complains that counsel did no more than he was retained and compensated (handsomely) to do, it is difficult to disagree.

For these reasons, Andrews Kurth's request for a 10% enhancement to the lodestar is disallowed.

---

[139] For example, one might reasonably argue that Davis Polk was overpaid in light of the results achieved by Andrews Kurth at a lower rate.

6.  Summary of Allowed Fees and Expenses

For the reasons set forth above, the following fees and expenses are allowed in the amounts listed:

| | |
|---|---|
| Fees Requested for 53rd Pay Period | $464,949.50 |
| Expenses Requested for 53rd Pay Period | $17,714.53 |
| Travel Time Requested for 53rd Pay Period | $3,180.00 |
| **Subtotal for 53rd Pay Period** | **$485,844.03** |
| Fees Requested for October 2012 | $0.00 |
| Expenses Requested for October 2012 | $0.00 |
| **Subtotal for October 2012** | **$0.00** |
| Fees Requested for Stub Period | $92,000.00 |
| Expenses Requested for Stub Period | $23,619.37 |
| Travel Time Requested for Stub Period | $3,180.00 |
| **Subtotal for Stub Period** | **$118,799.37** |
| FDIC Litigation Interim Fee Reductions | $310,193.78 |
| E&Y Litigation Interim Fee Reductions | $262,750.30 |
| Boston Housing | $140,764.70 |
| Deal/Deposition/Trial Meals | $0.00 |
| Secretarial/Staff Overtime (Litigation) | $0.00 |
| Special Supplies | $0.00 |
| Document Management | $63,189.20 |
| 50% Travel Time Through 52nd Pay Period | $0.00 |
| 50% Travel Time for 53rd Pay Period | $0.00 |
| 50% Travel Time for Stub Period | $0.00 |
| **Subtotal of Deferred Requests** | **$776,897.98** |
| Enhancement (10% Lodestar Multiplier) | $0.00 |
| | |
| **Total Awarded in AK Application** | **$1,381,541.38** |
| | |
| Fees Awarded Through 52nd Pay Period | $30,411,944.11 |
| Expenses Awarded Through 52nd Pay Period | $2,947,880.79 |
| Travel Time Awarded Through 52nd Pay Period | $850,018.70 |
| **Subtotal Through 52nd Pay Period** | **$34,209,843.60** |
| | |
| **FINAL COMPENSATION AWARDED** | **$35,134,037.69** |

45

B. The Branch Application

Section 326(a) of the Bankruptcy Code, titled "Limitation on compensation of trustee,"

provides:

> In a case under chapter 7 or 11, the court may allow reasonable compensation
> under section 330 of this title of the trustee for the trustee's services, payable after
> the trustee renders such services, not to exceed 25 percent on the first $5,000 or
> less, 10 percent on any amount in excess of $5,000 but not in excess of $50,000, 5
> percent on any amount in excess of $50,000 but not in excess of $1,000,000, and
> *reasonable compensation not to exceed 3 percent of such moneys in excess of*
> *$1,000,000*, upon all moneys disbursed or turned over in the case by the trustee to
> parties in interest, excluding the debtor, but including holders of secured
> claims.[140]

The statute is clear that the 3% is not an entitlement,[141] nor is it presumed to be reasonable.[142]  It

is a statutory cap that the court is to consider as part of its reasonableness inquiry.[143]  The proper

starting point is the lodestar.[144]

According to Dr. Branch's records, he has devoted 17,946.30 hours to work on the estate

and 2,404.70 hours in travel time.[145]  At his regular hourly rates, which have ranged from $300

to $850, Dr. Branch would be entitled to reasonable compensation in the amount of $9,295,087

under the lodestar analysis.[146]  This would result in a commission of approximately 2.65%.  The

question presented by the Branch Application is whether he should receive the maximum

---

[140] 11 U.S.C. § 326(a).

[141] *See, e.g., In re Galabini*, 472 B.R. 575, 578 (Bankr. D. Idaho 2012); *In re C&D Dock Works, Inc.*, 437 B.R. 443, 445 (Bankr. M.D. Fla. 2010); *In re Rybla*, 339 B.R. 464, 468 (Bankr. N.D. Ill. 2006).

[142] *See In re Mack Properties, Inc.*, 381 B.R. 793, 798 (Bankr. M.D. Fla. 2007).

[143] *Connolly v. Harris Trust Co. of California (In re Miniscribe Corp.)*, 309 F.3d 1234, 1241 (10th Cir. 2002); *In re Mack Properties, Inc.*, 381 B.R. at 798; *In re Clemens*, 349 B.R. 725, 729 (Bankr. D. Utah 2006).

[144] *In re Miniscribe Corp.*, 309 F.3d at 1244; *In re 1031 Tax Group, LLC*, 07-11448 (MG), 2009 WL 4806199 (Bankr. S.D.N.Y. Dec. 9, 2009); *In re Marvel Entm't Group, Inc*., 234 B.R. 21, 39 (D. Del. 1999).

[145] Docket No. 2526, Ex. 9-C.

[146] *Id.*

compensation of 3% on distributions in excess of $1,000,000, raising his total compensation to $10,567,648.69.

I think yes.  Much like his counsel, there can be little doubt that Dr. Branch's services to the estate have been of the highest quality and beneficial to the estate.  That is precisely why he was elected Chapter 7 trustee.  Unlike his counsel, however, Dr. Branch has not received regular interim payments, but instead has suffered substantial delays in payment.[147]  Indeed, to date, his interim payments amount to approximately 56% of his lodestar entitlement for the last twenty-one years.  Under the circumstances, a $1,272,561.69 enhancement, though 13.7% higher than Dr. Branch's hourly rate, is reasonable in light of the substantial delay in receipt.  Therefore, the Branch Application is approved.

---

[147] *Id.*

## V. **<u>CONCLUSION</u>**

In light of the foregoing, I will enter an approving in part and disapproving in part the AK Application, approving the Branch Application, and directing Dr. Branch to file a further amended final report consistent with the reductions made herein.

_____
William C. Hillman
United States Bankruptcy Judge

Dated: December 27, 2012


Counsel Appearing:

    Robin Russell, Paul Silverstein, Andrews Kurth, LLC, Houston, TX,
        for the Dr. Ben Branch, the Chapter 7 trustee
    Jennifer Hertz, Office of the United States Trustee, Boston, MA,
        for the United States Trustee
    Dianne F. Coffino, Covington & Burling LLP, New York, NY,
        for Bank of New York Mellon Trust Company, N.A., as Indenture Trustee
    Katherine A. Constantine, Dorsey & Whitney, LLP, Minneapolis, MN,
        for U.S. Bank National Association, as Indenture Trustee
    Steven Weiss, Shatz, Schwartz and Fentin, P.C., Springfield, MA
        for Bank of New York Mellon Trust Company, N.A., and U.S. Bank
        National Association, as Indenture Trustees